## STATE OF CONNECTICUT *v.* CLIFFORD L. LOVELACE (10910)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued October 7—decision released December 13, 1983

*Jon C. Blue,* assistant public defender, with whom, on the brief, was *Jerrold H. Barnett,* public defender, for the appellant (defendant).

*John F. Cocheo,* assistant state's attorney, with whom was *C. Robert Satti,* state's attorney, for the appellee (state).

PARSKEY, J. This is an appeal from a conviction of murder in violation of General Statutes § 53a-54a. The defendant's sole claim of error is that the trial court erred in granting the state's midtrial motion to compel the defendant to submit to an additional psychiatric examination.

The underlying facts are not in dispute. On April 4, 1980, the defendant fatally shot his wife. Minutes after the shooting, the defendant called the police and confessed. The details of the crime and the circumstances under which it occurred were described by two subsequent and more detailed confessions. Given these confessions, the only issue at trial was the defendant's mental state at the time of the homicide.

Prior to the trial, the following psychiatric examinations were conducted: On April 8, 1980, at the request of defense counsel, Dr. Hans Langhammer, a psychiatrist, examined the defendant.[1] He concluded that the

---

[1] Langhammer re-examined the defendant on April 6, 1981.

defendant had acted under the influence of extreme emotional disturbance. On June 6, 1980, the court, pursuant to Practice Book § 760, granted the state's motion for a psychiatric examination of the defendant by Dr. Robert B. Miller.[2] The defendant's counsel, however, had neglected to inform the defendant that he was required to submit to this examination and hence, the defendant told Miller that he could not discuss the case with him. Consequently, Miller could not make a meaningful evaluation of the defendant's mental state at the time of the crime. As a result, on August 7, 1980, the state again moved the court "to order the defendant to submit to a psychiatric examination." This motion was granted without opposition. Since Miller was now ill and unable to conduct this examination, at the state's request, the court appointed Dr. Alexander Parthenis, a psychiatrist, to conduct the examination. Parthenis examined the defendant on September 9, 1980, and also concluded that the defendant had acted under the influence of extreme emotional disturbance.

On November 21, 1980, pursuant to Practice Book §§ 758 and 759, the defendant filed notice that he intended to introduce expert testimony on the issue of his mental state. The state made no further pretrial motions pertaining to this issue.

The trial began on April 29, 1981. The state concluded presentation of its case-in-chief on May 5 and that afternoon the defendant began his presentation. In addition to other witnesses, the defendant called Langhammer

---

[2] Although the text of the state's motion followed the Practice Book in requesting the court to order an examination "by the psychiatrist designated by the court," Miller was named in the proposed order appended by the state to its motion. Even though the defendant had not yet filed notice that he intended to introduce evidence of his mental state; Practice Book §§ 758 and 759; he did not object to this order.

and Parthenis, both of whom testified that the defendant had acted under the influence of extreme emotional disturbance. The defense rested on May 6.

On the next day the state had planned to call as a rebuttal witness Miller, who had unsuccessfully attempted to examine the defendant the previous year.[3] Miller again became ill, however, so the trial was recessed until the following Tuesday, May 12. By Monday, May 11, it became apparent that Miller's illness was severe and that he would be unable to testify. Hence, on May 12, the state moved that the court compel the defendant to submit to a psychiatric examination by an expert of its choice, Dr. James Alexander. The court granted the motion over the defendant's objection. When the defendant's counsel informed the court he would advise his client to remain silent during the examination, the court, citing Practice Book § 761, indicated that the defendant ran the risk of having the testimony of Langhammer and Parthenis stricken if he did not cooperate.

Alexander, after examining the defendant on May 13, testified on May 15 that while the defendant was "emotionally disturbed," he "could not classify that disturbance as extreme emotional disturbance." On May 19, the case went to the jury, which found the defendant guilty of murder.

The defendant presses a single claim in three parts, namely, that compelling him to submit to an additional psychiatric examination (1) was not authorized by appli-

---

[3] In its brief, the state asserts that Miller intended to give an expert opinion. The defendant states in his brief that the state had represented that Miller's expert opinion would not be based on his prior meeting with the defendant in June, 1980, but rather "in response to hypotheticals based on the evidence previously presented in the case."

cable provisions of the Practice Book; (2) contravened his constitutional privilege against self-incrimination; and (3) denied him due process.

I

Practice Book §§ 757 through 761, inclusive, relate to defenses based on the defendant's mental state. If the defendant intends to rely on such defense or if he intends to introduce expert testimony relating to a mental disease or defect or to any other condition bearing upon the issue whether he had the requisite mental state for the offense charged, he is required to notify the prosecuting authority in writing of such intention and to furnish him with copies of pertinent medical reports. The prosecutor may then move to have the defendant examined by a psychiatrist of the state's choice and in an appropriate case the court may order that the defendant be so examined. In the event of a failure of the defendant to give the required notice, furnish appropriate reports, or submit to the ordered examination, the court may exclude the testimony of any expert witness offered by the defendant on the issue of his mental state.

The defendant concedes that the court was authorized to compel him to submit to a psychiatric examination but he argues that, having submitted voluntarily to an examination by a psychiatrist selected by the prosecutor, the court was precluded from ordering him to submit to an additional examination. Section 760[4] need not be read so narrowly. Whether to order one or more examinations is a matter addressed to the discretion of the court. Ordinarily motions for discovery, including motions for psychiatric examination, should be made

---

[4] The relevant portion of Practice Book § 760 reads as follows: "In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court."

550

pretrial. Practice Book §§ 809, 811. For good cause shown, however, such motions may be entertained at a later time. Practice Book § 810. In this case Miller had been selected initially by the prosecutor to examine the defendant. His examination was incomplete because of the defendant's refusal to cooperate. The state nevertheless was prepared to offer him as a rebuttal witness by means of hypothetical questions. Unfortunately Miller's illness prevented him from testifying. The inability of an expert witness to testify due to illness is sufficient "good cause" to permit the court to exercise its discretion in favor of ordering an additional psychiatric examination during the trial.

II

The privilege against self-incrimination embodied in the fifth amendment and made applicable to the states by the fourteenth amendment to the constitution of the United States; *Malloy* v. *Hogan,* 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (1964); protects an accused against compulsory submission to psychiatric examination. *Estelle* v. *Smith,* 451 U.S. 454, 468, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981). A similar result obtains under article first, § 8, of the constitution of Connecticut. The question presented by this case, however, is not the existence of the privilege but rather the extent of the defendant's waiver.

The defendant concedes that by asserting a defense based upon his mental state he did waive his privilege against self-incrimination to some extent, but he argues that the waiver was limited to giving the state a fair opportunity to obtain countervailing testimony. That opportunity was afforded, he contends, when he submitted to an examination by Parthenis. Thereafter he claims he had a right to reassert the privilege. We disagree. By raising the issue of his mental state at the time of the offense, by submitting to psychiatric exam-

ination by his own examiners and by presenting evidence as to his mental state, the defendant raised the issue of his mental state for all purposes; thereafter he could not, by his silence, determine the ground rules for the determination of his claim. See *Estelle* v. *Smith*, supra, 465–66; *Pope* v. *United States,* 372 F.2d 710, 721 (8th Cir. 1967) (en banc), vacated and remanded on other grounds, 392 U.S. 651, 88 S. Ct. 2145, 20 L. Ed. 2d 1317 (1968); *Lee* v. *County Court of Erie County,* 27 N.Y.2d 432, 440, 267 N.E.2d 452, cert. denied, 404 U.S. 823, 92 S. Ct. 46, 30 L. Ed. 2d 50 (1971).

We analogize to the fifth amendment right of a defendant to remain silent. "In *State* v. *Griswold,* 67 Conn. 290, 307, 34 A. 1046 [1896], commenting particularly on an accused's taking the stand in a criminal case in his own behalf, this court noted that by taking the stand the accused 'subjected himself to the same rules, and was called upon to submit to the same tests which could by law be applied to other witnesses . . . . Having elected to become a witness in his own behalf, he occupied for the time being the position of any other witness, with all its duties and obligations.' " *State* v. *Moynahan,* 164 Conn. 560, 599, 325 A.2d 199, cert. denied, 414 U.S. 976, 94 S. Ct. 291, 38 L. Ed. 2d 219 (1973).

In any criminal prosecution the defendant has a choice to testify or to remain silent. "The Constitution safeguards the right of a defendant to remain silent; it does not assure him that he may remain silent and still enjoy the advantages that might have resulted from testifying." *Stein* v. *New York,* 346 U.S. 156, 177, 73 S. Ct. 1077, 97 L. Ed. 1522 (1953). Nor does the constitution guarantee that if he chooses to testify he will be insulated from the usual consequences of cross-examination. Similarly, the defendant may decide

whether to raise the issue of his mental state but if he chooses to do so he exposes his mental processes to reasonable examination by the state. Thereafter the issue of whether this is "an appropriate case" for an additional examination and the extent of such examination is determined by the exercise of judicial discretion and the requirements of due process.

## III

At the outset, we note that "[a]s in all cases involving what is or is not due process, so in this case, no hard and fast rule can be laid down. The pattern of due process is picked out in the facts and circumstances of each case." *Brock* v. *North Carolina,* 344 U.S. 424, 427–28, 73 S. Ct. 349, 97 L. Ed. 456 (1953). With this in mind we consider the defendant's claim that the additional compelled examination denied him a fair trial.

The defendant concedes that multiple examinations by the state would not be unconstitutional if pursued via a single pretrial order.[5] He does not claim that this added examination constituted harassment or an undue burden. Essentially, the defendant's objection is one of timing: that by ordering this examination midtrial, after the defense had rested, the judge turned the trial into a "game of chance" in which the defendant was unfairly disadvantaged. We do not agree.

The due process clause "does speak to the balance of forces between the accused and his accuser." *Wardius* v. *Oregon,* 412 U.S. 470, 474, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973). A close examination of this trial reveals

---

[5] The defendant draws a distinction between multiple examinations prescribed in a single pretrial order, and sequential examinations directed in a number of orders. The defendant concedes that the former is permissible but argues that the latter should be proscribed because it subjects the defendant to repeated instrusions. We see no distinction between the two. Since it is contemplated that the examinations would be sequential in both instances the form of the order can hardly be regarded as significant.

that the trial court's order did not unconstitutionally tip this balance. The defendant submitted to an examination by a psychiatrist of his choice and then to one by a psychiatrist of the state's choice. When the state learned that its psychiatrist's conclusion favored the defendant, it made this information available to the defendant, as required by Practice Book § 741 and the Code of Professional Responsibility, DR 7-103 (B). The defendant presented the testimony of these two experts and pointed out to the jury that one of them had been hired and paid for by the state. The state proceeded to trial intending to call Miller to respond to hypothetical questions. It did not deliberately change tactics mid-trial. Indeed, when the state learned of Miller's illness, the trial was recessed to afford Miller the chance to testify. Only when it became clear that he would be unavailable did the state move for and the court grant the additional examination. The defendant cross-examined the state's expert witness. He could have introduced additional evidence or expert testimony in rebuttal to Alexander, but he chose not to do so. The trial closed with the defendant having two experts' testimony and the state having one. We cannot say that this scenario deprived the defendant of a fair trial.

"Every accused is entitled to a fair trial, that is, one conducted, in all material things, in substantial conformity to law. . . . It is one at which the legal rights of the accused are safeguarded and respected." *Wojculewicz* v. *Cummings*, 143 Conn. 624, 632–33, 124 A.2d 886 (1956). At some point, ordering repeated examinations will deprive a defendant of a fair trial. In the exercise of its discretion and duty to safeguard the defendant's legal rights, the court, in contemplating such an order, must consider a number of factors, including the potential for harassment, the invasiveness of the examination and unfair surprise. In this case,

no claim was made that the examination constituted harassment or an undue burden or that it was a probe into irrelevant areas. The defendant does claim that the fact that Alexander testified nine days after the defense rested unfairly highlighted that testimony. The defendant did cross-examine Alexander and could have further diminished the impact of his testimony by introducing additional evidence in rebuttal. Given the emergency created by Miller's unforeseen illness, we cannot say that the court abused its discretion or deprived the defendant of a fair trial by ordering the examination.

Nothing in the cases that the defendant cites leads us to a contrary conclusion. In characterizing the state's action as "gamesmanship" the defendant cites the language of *Williams* v. *Florida,* 399 U.S. 78, 82, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970), which rejects a "poker game" theory of the criminal trial. As stated earlier, we do not believe that the state engaged in gamesmanship by moving for another examination.[6] The defendant then cites *Wardius* v. *Oregon,* supra, for the proposition that the court's order rendered the balance between the accused and the accuser unfair. The imbalance that offended the *Wardius* court was that Oregon's notice of alibi rule required disclosure by the defendant but not by the state. Unlike the situation in *Wardius,* the defendant here was not deprived of a countervailing opportunity to search for the truth. Indeed, he benefited from his own search and the state's as well.

Lastly the defendant cites *Santobello* v. *New York,* 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971),

---

[6] *Williams* v. *Florida,* 399 U.S. 78, 82, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970), upheld Florida's notice of alibi rule against a due process challenge because it imposed reciprocal duties and obligations on the defendant and the state and, hence, ensured that the trial would not be a poker game. Cf. *Wardius* v. *Oregon,* 412 U.S. 470, 474, 93 S. Ct. 2208, 37 L. Ed. 2d 82 (1973).

for the premise that once the defendant submitted to an initial examination requested by the state, he fulfilled his end of the bargain implicit in Practice Book § 760, and the threat by the court to deprive him of his own experts' testimony breached this bargain and compounded the unfairness. *Santobello* is inapposite because that case dealt with an express bargain, that of a plea, on which the state reneged. Moreover, as previously discussed, the relevant Practice Book sections do not limit the state to one examination.

There is no error.

In this opinion the other judges concurred.