STATE OF CONNECTICUT *v.* RUSSELL F. MANFREDI
(13706)

PETERS, C. J., HEALEY, CALLAHAN, GLASS and COVELLO, Js.

Argued November 1, 1989—decision released January 30, 1990

*Michael R. Sheldon,* with whom was *Todd D. Fernow,* for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom were *John M. Bailey,* state's attorney, and, on the brief,

*Herbert Appleton,* assistant state's attorney, and *Paul Edwards,* student intern, for the appellee (state).

PETERS, C. J. The dispositive issue in this appeal is the validity of the trial court's orders requiring the defendant to submit to a series of psychiatric examinations before the defendant filed notice of his intent to rely on thè defenses of insanity and extreme emotional disturbance. A jury of twelve found the defendant, Russell F. Manfredi, guilty of manslaughter in the first degree, in violation of General Statutes § 53a-55 (a) (2),[1] and the court, *Corrigan, J.,* sentenced him to a term of imprisonment of twenty years. The defendant appealed this judgment to the Appellate Court. *State* v. *Manfredi,* 17 Conn. App. 602, 555 A.2d 436 (1989). The Appellate Court held that the trial court had erred by ordering the compulsory psychiatric examinations before the defendant had asserted his mental status defenses, but upheld the defendant's conviction after concluding that the defendant had not been prejudiced by the error. We granted the defendant's petition for certification to appeal from the Appellate Court; *State* v. *Manfredi,* 211 Conn. 809, 559 A.2d 1142 (1989);[2] and conclude that the trial court did not err in ordering the defendant to undergo the psychiatric examinations.

[1] General Statutes § 53a-55 provides in pertinent part: "(a) A person is guilty of manslaughter in the first degree when . . . (2) with intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he committed the proscribed act or acts under the influence of extreme emotional disturbance . . . . "

[2] We granted certification to appeal the following question: "Did the Appellate Court err in sustaining the admission of expert psychiatric testimony elicited by the state in advance of the filing of notice of intent to rely on a defense of mental disease or defect?" Pursuant to Practice Book § 4140, the state also filed the following question as an alternative ground for affirming the judgment of the Appellate Court: "Whether this was an appropriate case under Practice Book § 760 for the trial court to order a psychiatric examination prior to the defendant's assertion of mental disease or defect under Practice Book § 759?"

The relevant facts are not in dispute. The victim, Catherine Manfredi, was found dead in her car in West Hartford on March 8, 1985. Although the car had been involved in an accident, the nature of the victim's injuries and her position in the car led the police to conduct further inquiry into the cause of her death. Following an autopsy of the victim, a day long investigation of the car and the home that the defendant and the victim had shared, and an interrogation of the defendant, the defendant was arrested on a warrant charging him with the murder of his wife.

The defendant was arraigned on March 11, 1985. The court, *Doyle, J.*, set bond at $150,000 and barred the defendant from any contact with his children pending further review of the situation. On March 13, 1985, the defendant moved for a modification of his bond. In support of this motion, the defendant presented the testimony of Walter A. Borden, M.D., who had briefly visited the defendant two days before the hearing. Borden testified that the defendant was "in a state of confusion, emotional confusion, depression, grief, [and] shock," and recommended that "he should be in a psychiatric hospital for a relatively short period of time." Following a hearing, the court, *Purtill, J.*, revised the defendant's bond to include a condition that he enter a hospital for psychiatric treatment and remain at that institution as long as required by his treating physician. The defendant was released on bond and entered John Dempsey Hospital on March 16, 1985.

On March 26, 1985, the state submitted a motion requesting a psychiatric examination of the defendant pursuant to Practice Book § 760[3] and also requesting

[3] "[Practice Book] Sec. 760. —— ——PSYCHIATRIC EXAMINATION

"In an appropriate case the judicial authority may, upon motion of the prosecuting authority, order the defendant to submit to a psychiatric examination by a psychiatrist designated for this purpose in the order of the court. No statement made by the defendant in the course of any examination pro-

an extension of the court's prior order prohibiting the defendant from seeing or communicating with his children. At the same time, the defendant moved the court to permit communication with his children, and submitted letters from Borden and from Bruce Greyson, M.D., in support of this request. After hearing argument on these motions, the court, *E. Y. O'Connell, J.,* ordered the defendant to submit to a psychiatric examination by Peter Zeman, M.D. In its ruling on the motion, the court noted that the examination was appropriate because the defendant had already introduced psychiatric evidence into the case, and because an additional expert opinion might assist the court in deciding upon the motions concerning the defendant's contact with his children and in evaluating the other conditions of his bond. The court also determined, based upon the evidence before it at that time, that the order prohibiting the defendant from having contact with his children should be extended.

The defendant thereupon moved for a protective order in connection with Zeman's psychiatric examination. Specifically, the defendant requested that: (1) no examinations be conducted without the presence of counsel; (2) the examinations be limited to matters concerning his competency to stand trial; (3) no question be asked of him relating to the events surrounding the death of his wife; and (4) any matters of substance elicited from him not be communicated to anyone other than himself or his counsel. The court, *E. Y. O'Connell, J.,* denied the motion, noting that, although the defendant had not yet filed notice of intent to rely on a defense of mental disease or defect, he had already introduced

---

vided for by Sec. 757, whether the examination shall be with or without the consent of the defendant, shall be admitted in evidence against the defendant on the issue of guilt in any criminal proceeding. A copy of the report of the psychiatric examination shall be furnished to the defendant within a reasonable time after the examination."

the "psychiatric aspect of the case" by presenting the testimony of Borden and the letters from Borden and Greyson. The court therefore concluded that "fairness, equity and justice required that the state be able to also have an examination in order that it could make certain representations and know where it was going with the case."

In accordance with the trial court's order, Zeman began a series of psychiatric examinations of the defendant in April, 1985. When the defendant refused to complete the examination process, the court, *E. Y. O'Connell, J.,* granted the state's motion to compel and, also in response to a request from the state, ordered the defendant to submit to psychological testing. In response, the defendant requested that the court order Zeman not to communicate to the state any information, with the exception of his diagnosis, that he might obtain during his examinations of the defendant. The state indicated that it was not opposed to a protective order that prohibited the state from obtaining substantive evidence concerning the crime.[4] Although the court expressed its reluctance to act on an oral motion since it might later be unclear as to the exact details of an oral ruling, it noted that there was merit to the defendant's request, and invited the defendant to "file such a motion as you deem appropriate and attach a suggestive order to it." Although the defendant filed a written motion the same day, the record does not reflect the trial court's disposition of the motion.

The examination process resumed, with Anne Marie Phillips, a clinical psychologist, conducting the psychological testing of the defendant and Zeman examining him on several additional occasions. In total, Zeman

---

[4] The state's sole objection to the proposed protective order was that the state should have access to more information than the diagnosis to the extent that the information concerned such collateral matters as would be relevant to the defendant's release conditions and contact with his children.

examined the defendant eight times and Phillips examined him twice (collectively, the prenotice examinations). It was not until nearly one year after the prenotice examinations had been conducted that the defendant filed notice, pursuant to Practice Book §§ 758 and 759,[5] of his intention to raise the defenses of insanity and extreme emotional disturbance. Following the filing of this notice, the court, *Barall, J.,* ordered that Zeman conduct an additional psychiatric examination of the defendant. Zeman thereafter examined the defendant on two occasions (the postnotice examinations).

At trial, the defendant took the stand and admitted that he had in fact killed his wife.[6] The defense there-

---

[5] "[Practice Book] Sec. 758. —— ——NOTICE BY DEFENDANT

"If a defendant intends to rely upon the defense of mental disease or defect at the time of the alleged crime, he shall, within the time provided for the filing of pretrial motions pursuant to Sec. 811 or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. If there is a failure to comply with the requirements of this section, mental disease or defect may not be raised as a defense. The judicial authority may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

"[Practice Book] Sec. 759. —— ——MENTAL DISEASE OR DEFECT INCONSISTENT WITH THE MENTAL ELEMENT REQUIRED FOR THE OFFENSE CHARGED

"If a defendant intends to introduce expert testimony relating to a mental disease or defect, or another condition bearing upon the issue of whether he had the mental state required for the offense charged, he shall, within the time provided for the filing of pretrial motions or at such later time as the judicial authority may direct, notify the prosecuting authority in writing of such intention and file a copy of such notice with the clerk. He shall also furnish the prosecuting authority with copies of reports of physical or mental examinations of the defendant made in connection with the offense charged, within five days after receipt thereof. The judicial authority may for cause shown allow late filing of the notice or grant additional time to the parties to prepare for trial or make such other order as may be appropriate."

[6] The defendant testified that, on the evening of March 7, 1985, he fatally struck his wife with a baseball bat after a night long series of arguments that had escalated to the point of the victim slapping and punching him

fore focused almost exclusively on his claims of insanity and extreme emotional disturbance. In support of those claims, the defendant presented several lay character witnesses to testify that he was not prone to anger, violence, or loss of temper. The defendant also offered extensive testimony from Borden, who had observed the defendant shortly after the crime and had subsequently interviewed him approximately twenty-five times. After describing in great detail the defendant's actions as he understood them, Borden testified that, in his opinion, the defendant had been suffering from a catathymic crisis on March 8, 1985, when he killed his wife.[7] That crisis was arguably triggered by his wife's hitting him with the baseball bat, an episode which revived the defendant's feelings of humiliation, degradation and rage over being hit with a yardstick as a child, with the result that the victim came to represent someone from the past. Borden thus concluded that the defendant had been totally out of control when he struck his wife, having acted directly contrary to his conscious thinking and values.

The state presented both Phillips and Zeman to rebut the defendant's defenses of insanity and extreme emotional disturbance. Phillips testified that it was her opinion, based upon a series of psychological examinations that she had administered, that the defendant was probably not suffering from a severe psychological dysfunction, thought disorder, impulse disorder, psychotic

as well as hitting him with the bat. The defendant further testified that he had not intended to hurt or kill his wife. He admitted, however, that he had attempted to conceal his responsibility for her death by throwing the victim's body out the window, placing her body in the car, and leaving her at the scene of the car accident and then fabricating the story that the victim had been vomiting blood and had attempted to drive herself to the hospital.

[7] Borden explained that a catathymic crisis centers on a relationship in which there has been significant difficulty and feelings of sexual inadequacy, and is tied to past emotional problems.

process, hallucinations or delusions on March 7 and March 8, 1985. Zeman testified that the defendant was "in a state of extreme agitation" at the time of his wife's death, and that he was suffering from an adjustment disorder with mixed emotional features, but concluded that he was not suffering from a psychotic disorder. Zeman further testified that it was his opinion that the defendant did not undergo a catathymic crisis. Neither Phillips nor Zeman offered any testimony concerning the facts relating to the defendant's involvement with his wife's death.[8]

Following his conviction, the defendant appealed to the Appellate Court, arguing, inter alia, that the trial court had erred in compelling him to submit to the prenotice psychiatric examinations.[9] The Appellate Court concluded that § 760 did not authorize a compulsory examination at the time that the trial court issued its orders because the defendant had not placed his mental status in issue until he asserted the defenses of insanity and extreme emotional disturbance. The court went on to conclude, however, that the error was harmless in light of the facts of this case. The court relied in particular on the trial court's finding that the postnotice examinations had not been tainted by the prenotice examinations. In addition, the court noted that there was no evidence that the prenotice and post-

[8] Indeed, Phillips was apparently unable to obtain any information from the defendant concerning his actions on March 7 and 8, as she testified that the defendant had refused to discuss that subject with her.

[9] The defendant also claimed that the trial court erred in: (1) instructing the jury that it could consider psychiatric testimony presented by the defense and by the prosecution in determining whether the state had proved the requisite intent to commit murder; and (2) refusing to permit defense counsel to be present at the prenotice examinations or to allow the defendant to record these examinations. The Appellate Court refused to review the first claim after determining that the defendant had not objected to the charge, and found no error on the second claim based on its conclusion that the right to counsel does not extend to compulsory psychiatric examinations. These conclusions are not at issue in the present appeal.

notice examinations had elicited different information, or that the state had used the prenotice examinations to acquire substantive information concerning the alleged crime. *State* v. *Manfredi,* supra, 17 Conn. App. 620. The defendant renews his challenges to the prenotice examinations in this appeal, arguing that the orders violated both § 760 and his privilege against self-incrimination and that the admission of testimony derived from the prenotice examinations requires reversal of his conviction.

I

We turn first to the question of whether the trial court exceeded its authority under § 760 when it ordered the defendant to submit to a series of psychiatric examinations over one year before the defendant declared his intent to rely on the defenses of insanity and extreme emotional disturbance. The defendant argues that, read together, Practice Book §§ 756 through 761 require that a trial court find one of the following three conditions before it can order a psychiatric examination over the defendant's objection: (1) the defendant has filed notice of intent to rely on the defense of mental disease or defect, in accordance with § 758; (2) the defendant has filed notice of intent to present expert testimony concerning a mental disease or defect inconsistent with the mental element required for the offense charged, in accordance with § 759; or (3) the defendant has in some other manner placed in issue his mental status at the time of the offense. Based upon this interpretation of the Practice Book, the defendant contends that the trial court's prenotice examination orders were invalid since none of the required conditions was present. We disagree.

Section 760 imposes no further condition on the ability of a trial court to order a compulsory psychiatric examination than a determination that the situation before the court presents "an appropriate case" for

such an examination, and we have previously held that this determination is committed to the discretion of the trial court. *State* v. *Lovelace,* 191 Conn. 545, 549, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984); see also E. Margolis, "In Defense of the Insanity Defense," 58 Conn. B.J. 389, 405 (1984). While our prior cases have upheld trial court actions compelling examinations under § 760 when a defendant has filed notice pursuant to §§ 758 or 759; see *State* v. *Lovelace,* supra; or when defense counsel has asserted a mental status defense at trial; *State* v. *Fair,* 197 Conn. 106, 111–12, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986); the defendant has cited no authority for the proposition that these are the only circumstances under which a court may order an examination. We conclude that the trial court exercised its discretion appropriately in this case.

At the time that the trial court ordered the prenotice examinations, the defendant had already presented expert testimony indicating that he had been experiencing serious emotional and mental difficulties. In addition, the trial court was aware that the defendant had been hospitalized, pursuant to his doctor's recommendations, for treatment of these problems. While the defendant had presented this evidence in connection with his motions to modify his bond conditions, and not in an effort to establish insanity or extreme emotional disturbance, it was reasonable for the court to conclude that these problems might be relevant to the question of whether the defendant was suffering from a mental disease or defect at the time of the offense. By permitting the state a psychiatric examination of the defendant at this time, the trial court was simply advancing the objective of § 760 to assure the state an opportunity to procure reliable and timely expert testimony that would enable it to meet a defendant's men-

tal status defense. L. Orland, 4 Connecticut Practice: Superior Court Criminal Rules (1986) p. 214; E. Margolis, supra, 404. Had the state been forced to await the defendant's assertion of his mental status defenses, notice of which was not forthcoming until the defendant had already undergone nearly one year of psychiatric treatment, the state's examination would have had little or no persuasive weight on the issue of the defendant's mental condition at the time of the offense.

We also find support for the trial court's order in several federal cases holding that a trial court has the power to order an examination of the defendant's mental condition at the time of the offense along with an examination concerning the defendant's competency to stand trial. See, e.g., *United States* v. *Wright,* 627 F.2d 1300, 1312 (D.C. Cir. 1980); *United States* v. *Reifsteck,* 535 F.2d 1030, 1033 (8th Cir. 1976); *United States* v. *Wade,* 489 F.2d 258, 258–59 (9th Cir. 1973); *United States* v. *Moudy,* 462 F.2d 694, 697 (5th Cir. 1972). While noting that "the discretion to enlarge the examination does . . . expose [the accused] to the possibility of bolstering the government's case," these courts have reasoned that consolidating the examinations is appropriate because it "allows economy of judicial and medical efforts, of prosecution and defense efforts, and of the accused's time" and because, "in the end, all concerned—court, counsel, and parties—have an interest in determining if the accused was incompetent at the time of the offense, if that is to be an issue, and we see no prejudice in the court's ordering that such determination be made sooner rather than later . . . ." *United States* v. *Moudy,* supra, 697. In the present case, the trial court's orders compelling the defendant to undergo psychiatric examination to determine his mental condition at the time of the offense along with the examinations inquiring into the propriety of the defendant's bond conditions served a simi-

lar function in economizing judicial and medical resources as well as minimizing the number of examinations that the defendant might be forced to undergo.

Central to our conclusion that a court may order a psychiatric examination under § 760 before a defendant has asserted a mental status defense is the availability of a protective order sealing the contents of any psychiatric reports, with the exception of the diagnosis, until the defendant has actually filed notice of his defenses. Such an order, authorized by Practice Book § 785, would eliminate any risk that the state might inappropriately acquire substantive information concerning the defendant's involvement with the alleged offense.[10] Although the record in this case does not indicate the trial court's disposition of a proposed protective order that the defendant had submitted at the court's suggestion, we need not inquire into whether the state made illicit derivative use of this information since the defendant has expressly conceded that it did not.

## II

The defendant also challenges the prenotice psychiatric examinations on the ground that the trial court's order compelling him to submit to these examinations violated his privilege against self-incrimination as guaranteed by the fifth amendment to the United States constitution.[11] According to the defendant, he did not place his mental status in issue, and thus could

---

[10] Practice Book § 760 also prohibits the state from using information obtained in a compulsory examination to meet its affirmative burden of proving the defendant's guilt of the offense. *State* v. *Fair,* 197 Conn. 106, 110–11, 496 A.2d 461 (1985), cert. denied, 475 U.S. 1096, 106 S. Ct. 1494, 89 L. Ed. 2d 895 (1986); *State* v. *Boscarino,* 204 Conn. 714, 734–37, 529 A.2d 1260 (1987).

[11] The fifth amendment to the constitution of the United States provides in pertinent part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

not be compelled to submit to a compulsory psychiatric examination, until he filed notice of his intent to rely on the defenses of insanity and extreme emotional disturbance. He maintains, therefore, that any expert testimony derived from compulsory examinations conducted before he filed notice of his mental status defenses must be excluded as the fruit of a constitutionally invalid waiver of his privilege against self-incrimination. Since all of the testing administered by Phillips and the majority of the examinations conducted by Zeman preceded the defendant's notice of his mental status defenses, he contends that it follows that the trial court's admission of this testimony was reversible error. We are not persuaded.

Our analysis begins with the well established proposition that the fifth amendment privilege against self-incrimination ordinarily protects a criminal defendant from compulsory psychiatric examinations. *Estelle* v. *Smith,* 451 U.S. 454, 468, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981); *State* v. *Fair,* supra, 109; *State* v. *Lovelace,* supra, 550. It is equally clear, however, that "[a] criminal defendant waives this privilege . . . when he places his mental status in issue." *State* v. *Fair,* supra. Once a defendant has waived the privilege, the state may require him to submit to a psychiatric examination, and the results of such an examination may be introduced at trial for the purpose of rebutting the defendant's mental status defenses. *State* v. *Fair,* supra, 110–12; *State* v. *Lovelace,* supra, 551–52; see also *Estelle* v. *Smith,* supra, 465. A defendant effectively places his mental status in issue for fifth amendment purposes by filing notice of intent to rely on a defense of insanity or extreme emotional disturbance; *State* v. *Lovelace,* supra, 550–51; or by presenting testimony in support of these defenses at trial. *State* v. *Fair,* supra, 111–12; see *Buchanan* v. *Kentucky,* 483

U.S. 402, 423, 107 S. Ct. 2906, 97 L. Ed. 2d 336, reh. denied, 483 U.S. 1044, 108 S. Ct. 19, 97 L. Ed. 2d 807 (1987).

In light of these precedents, the question presented in this case, one that neither this court nor the Supreme Court of the United States has previously addressed, is whether a defendant may ever be said to have placed his mental status in issue, thereby waiving his privilege against self-incrimination, even though he has not yet formally filed notice of his intent to rely on a mental status defense. Our review of the record persuades us, contrary to the conclusion of the Appellate Court, that this defendant had placed his mental status in issue before the trial court ordered him to undergo psychiatric examination.[12] As the trial court expressly noted, the defendant had introduced "the psychiatric aspect of the case" before the state requested an examination. Furthermore, as we have already discussed, the defendant had presented psychiatric evidence to the trial court on two separate occasions indicating that he was suffering from emotional and mental difficulties so serious that he required hospitalization. While the defendant's objective in submitting this evidence was to support his motions to modify his bond conditions, and not to establish insanity or extreme emotional disturbance, the presentation of the evidence nevertheless served to apprise the court that there was some question as to whether the defendant's mental condition was consistent with his culpability for the alleged crime.

The defendant nevertheless maintains that he had not waived his privilege against self-incrimination because he had not formally placed his mental status

---

[12] At oral argument, the state asserted that this case presents no fifth amendment problem whatsoever in light of dictum in the recent decision of the Supreme Court of the United States in *Powell* v. *Texas,*      U.S.      , 109 S. Ct. 3146, 106 L. Ed. 2d 551 (1989). According to the state, *Powell*

in issue by filing notice of his intent to rely on a mental status defense. This argument ignores the principle that our fifth amendment jurisprudence "strikes a balance between the legitimate needs of the state and the cognizable rights of the defendant." *State* v. *Fair,* supra, 110. While the defendant must be free from compulsion to disclose incriminatory information concerning the offense for which he has been charged, courts have frequently reiterated that the state must be afforded some opportunity to acquire information that will enable it to "respond intelligently to defenses that concern a defendant's mental status." Id.; *United States* v. *Byers,* 740 F.2d 1104, 1113 (D.C. Cir. 1984); *United States* v. *Reifsteck,* supra, 1034; *Alexander* v. *United States,* 380 F.2d 33, 39 (8th Cir. 1967). In this case, the defendant had presented to the trial court substantial evidence regarding his psychological problems. On the basis of that evidence, the court had reasonable grounds to find that the defendant's mental status might be an issue in the case, and to conclude that a psychiatric examination would be essential to the state's ability to respond intelligently to a mental status defense.[13] See *United States* v. *Jines,* 536 F.2d 1255, 1256 (8th Cir.), cert. denied, 429 U.S. 942, 97 S. Ct. 361, 50 L. Ed. 2d 312 (1976). A requirement that the state wait what was in this case nearly one year until the defendant files

v. *Texas* establishes that a subsequent assertion of a mental status defense serves to validate even previous psychiatric examinations that were conducted in violation of a defendant's privilege against self-incrimination. Id., 3149. Since we conclude that the defendant had placed his mental status in issue by the time the trial court ordered the prenotice psychiatric examinations, we need not address this argument in this case.

[13] We note that in analogous circumstances, when it is the defendant who needs access to the psychiatric history of a witness, we have held that the patient-psychiatrist privilege must yield when the defendant has demonstrated that there is " 'any *reasonable basis* in the evidence for believing that psychiatric personnel may have information relating to the mental condition of a witness that might affect his testimony . . . . ' " (Emphasis added.) *State* v. *Hufford,* 205 Conn. 386, 403–404, 533 A.2d 866 (1987); *State* v. *Pierson,* 201 Conn. 211, 227, 514 A.2d 724 (1986).

a formal notice of a mental status defense, while the defendent in the meantime undergoes psychiatric treatment, would serve only to ensure that any evidence the state did eventually acquire regarding the defendant's mental condition at the time of the offense would be less than fully reliable.

Moreover, the case law indicates that a court may, under certain circumstances, impose a mental status defense on an unwilling defendant. In *State* v. *Asherman*, 193 Conn. 695, 731–32, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985), for example, we held that a trial court can charge the jury on extreme emotional disturbance even if the defendant does not wish to present that defense. Similarly, courts have held that a trial court has a responsibility to introduce the insanity defense, even if the defendant has refused to do so, if the evidence raises a significant question concerning the defendant's sanity. *United States* v. *Wright,* supra, 1307, 1310–11; *Whalem* v. *United States,* 346 F.2d 812, 818–19 (D.C. Cir.), cert. denied, 382 U.S. 862, 86 S. Ct. 124, 15 L. Ed. 2d 100, reh. denied, 382 U.S. 912, 86 S. Ct. 245, 15 L. Ed. 2d 164 (1965). A necessary concomitant of the judicial duty to consider mental status defenses sua sponte is the power to seek expert assistance in evaluating the defendant's psychological problems. *United States* v. *Wright,* supra, 1312; *United States* v. *Jines,* supra, 1256. The court's independent authority to order an inquiry into mental status is analogous to its power to order an examination concerning mental competency at the time of trial whether or not the defendant has raised the issue. See *Estelle* v. *Smith,* supra, 465.

Finally, we emphasize that a compulsory prenotice psychiatric examination is available only under very limited circumstances, and an order compelling submission to such an examination must be carefully structured to ensure compliance with the provisions of § 760

and to protect the defendant's privilege against self-incrimination. Accordingly, we now hold, as a general matter, that in the absence of timely objections, a trial court must satisfy the following three prerequisites before ordering a criminal defendant to undergo psychiatric examination prior to the time he has asserted a mental status defense. First, the court must find that the defendant has presented substantial evidence regarding his mental condition that furnishes reasonable grounds for concluding that his mental status at the time of the crime may be an issue in the case. Second, the court must indicate, on the record, the basis for its finding that the defendant has placed his mental status in issue. Third, the court must impose an appropriate protective order regarding communication between the state and the examining physician.

Applying this standard to this case, the evidence to which we have already alluded clearly satisfies the first prerequisite, and the trial court detailed these findings on the record, in accordance with the second prerequisite. With respect to the court's obligation to craft an appropriate protective order, it is unclear from the record whether the defendant waived this protection at the time of the prenotice examinations.[14] We need not further explore this deficiency in the record, however, in light of the defendant's concession that the state did not make any improper derivative use of the information acquired in the prenotice examinations.

The judgment of the Appellate Court is affirmed.

In this opinion CALLAHAN, GLASS and COVELLO, Js., concurred.

---

[14] As we previously indicated, the trial court invited the defendant to submit a proposed protective order, and the state did not object to such an order as long as the state would be permitted access to information relevant to the defendant's bond conditions. Although the defendant did file a motion and suggested order, the record does not indicate the trial court's disposition of the motion.

ARTHUR H. HEALEY, J., dissenting in part and concurring in part. I respectfully disagree with Part I of the majority opinion. I, however, join in affirming the judgment of the Appellate Court.

I

Prior to discussing the majority's analysis in Part I, it is important to set out some additional circumstances, none of which are in dispute. On March 26, 1985, after the state filed its motion asking for a psychiatric examination of the defendant, pursuant to Practice Book § 760, and sought a continuation of the prior court order prohibiting him from seeing or communicating with his children, the defendant moved for permission to see his children. The trial court granted the state's motion for a psychiatric examination and in early April, 1985, Peter Zeman, a psychiatrist, began a lengthy series of psychiatric examinations of the defendant that, when concluded in July, 1986, included ten separate sessions totaling about seventeen hours. Eight of these examinations were conducted in April and May of 1985, with at least four of them occurring even before the start of the defendant's hearing in probable cause. Certain psychological testing also ordered by the court was performed by Anne Marie Phillips, a clinical psychologist, on April 29, 1985, and May 7, 1985.[1]

It is important to note that all of these events occurred before the probable cause hearing even started on May 17, 1985.[2] That date was fifty-three days after the examinations were ordered and at least forty-five days after the first examination was con-

---

[1] There does not appear, especially from anything the trial court said, that the examinations ordered concerned the competency of the defendant to stand trial. See General Statutes § 54-56d.

[2] There appears to be no question that from the outset defense counsel properly objected and excepted to all of the rulings involving the court-ordered examinations and endeavored completely to protect the defendant's rights throughout the pretrial and trial proceedings in this regard.

ducted. On June 18, 1985, the state filed an information charging the defendant with murder, to which he pleaded not guilty and elected a jury trial. On May 9, 1986, the defendant filed his notice of intent to raise the defenses of mental disease or defect and extreme emotional disturbance to be supported by expert testimony. Thereafter, pursuant to an order of the court, the defendant was again examined by Zeman on two occasions, June 10, 1986, and June 24, 1986. Trial began on September 23, 1986, and, on December 18, 1986, the jury returned a verdict of guilty of manslaughter in the first degree in violation of General Statutes § 53a-55.

Although the majority does not expressly say so, the only fair reading of that opinion upholding the trial court is that the "situation before the court" presented "an appropriate case" for ordering such an examination. The ineluctable consequence of this determination under the circumstances is that the defendant had in some manner placed in issue his mental status at the time of the offense. This, of course, is entirely based on circumstances that took place long before the defendant had been accorded the constitutionally guaranteed right under the Connecticut constitution of a probable cause hearing to decide whether he should "be held to answer for [the] crime [of murder]." Specifically, our constitution provides: "No person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law . . . . " Conn. Const., amend. XVII. It is difficult to understand how this defendant can be said to have indicated that he "intend[ed] to introduce expert testimony relating to a mental disease or defect, *or another condition* bearing upon the issue of whether he had the mental state required for the offense charged . . . " (emphasis added); Practice Book § 759;

long before he was legally charged with murder "in accordance with the procedures prescribed by law."[3] Conn. Const., art. I, § 8. Prior to the constitutional determination that probable cause existed after the hearing required by General Statutes § 54-46a, there was no crime to which he could even properly be required to plead; he was not even constitutionally or statutorily accused of murder until that probable cause hearing had made it possible for the state to take that step. This was no formalistic step; it was constitutionally mandated. In *State* v. *Lovelace,* 191 Conn. 545, 549, 469 A.2d 391 (1983), cert. denied, 465 U.S. 1107, 104 S. Ct. 1613, 80 L. Ed. 2d 142 (1984), we said that "Practice Book §§ 757 through 761, inclusive, relate to defenses based on the defendant's mental state." At the very least, this defendant could not appropriately be said to have set up or notified the state of this "defense" or any defense until he had been constitutionally accused of murder and entered his plea to the information, as he did on June 18, 1985.[4]

Putting aside for the moment the state's ability to have a meaningful evaluation of his mental state, unless ordered at the time it was in this case, was it "appropriate" for the trial court to conclude, as it did long before the probable cause hearing, that "fairness,

[3] The fact that prior to the constitutional probable cause hearing that started on May 17, 1985, the defendant was being held on an arrest warrant charging murder demonstrates no more than that a disinterested magistrate had found probable cause to believe that he had committed that crime.

[4] Actually, there is no claim that the defendant should have filed his notice of intent under Practice Book §§ 757 through 761 at that time or anywhere near that time. He did not actually file that notice until almost one year later, i.e., on May 6, 1986. I do not dispute that over that period he was receiving psychiatric treatment nor can it be overlooked that the state had had those series of psychiatric and/or psychological sessions with the defendant, which are chronicled above, since March, 1985, and the final two sessions in 1986 after the notice of intent was filed by the defendant. I do not understand that the defendant "made" the state wait until May 6, 1986, before he filed this notice.

equity and justice require that the State be able to also have *an* examination in order that it could make certain representations and know where it was going with the case?'' (Emphasis added.) I think not. It so concluded because it said that the defendant had already "introduced the psychiatric aspect of the case" by presenting the testimony of psychiatrist Walter A. Borden and the letters from Borden and psychiatrist Bruce Greyson. The majority acknowledges that "[w]hile the defendant had presented this evidence in connection with his motions to modify his bond conditions, and not in an effort to establish insanity or extreme emotional disturbance . . . " yet "it was reasonable for the court to conclude that these problems might be relevant to the question of whether the defendant was suffering from a mental disease or defect at the time of the offense." The majority continues and points out that permitting "*a* psychiatric examination" (emphasis added) at that time "simply advanc[ed] the objective of § 760 to assure the state an opportunity to procure reliable and timely expert testimony that would enable it to meet a defendant's mental status defense."

Against this background, I do not agree with the majority that this presents "an appropriate case" under § 760 for the trial court to enter the orders which it did.[5] First, it is fair to say that the state knew where it was going with the case; it first had to go to a probable cause hearing. Parenthetically, the statute governing such a hearing provides in part: "No motion to suppress or for discovery shall be allowed in connection with such hearing." General Statutes § 54-46a (b). Query whether ordering the mental examination here at the time it was could ever be said to allow "discov-

---

[5] I can, however, envisage a scenario under a demandingly different fact pattern which might present "an appropriate case" under Practice Book § 760 to have a mental status examination of a defendant even before the constitutional probable cause hearing.

ery" under § 54-46a. Second, it is incongruous to me how the trial court can reasonably bottom its subsequent orders on the opinion that the defendant has already "introduced the psychiatric aspect of the case" to mean, as it must, that the defendant has put his mental status at the time of the offense in issue. In my view, this was an abuse of discretion and, hence, clearly erroneous. Whether the trial court felt that the "problems" indicated by the evidence adduced concerning bond conditions "might be relevant to the question whether the defendant was suffering from a mental disease or defect at the time of the offense" was itself not only irrelevant at that time but, more to the point, it was in derogation of the defendant's rights as already set out and to which now may be added his fifth amendment privilege against self-incrimination from compulsory psychiatric examinations. I cannot deny that he had presented psychiatric evidence, but how can it reasonably be said that he had placed in issue, in this case, his mental status at the time of the offense? It simply cannot. To utilize the previous psychiatric evidence in another circumstance to say that the defendant has already "introduced the psychiatric aspect of the case" and to go on to say that he has put his mental status at the time of the offense in issue under § 760 is a quantum leap of the superlative degree.

I have absolutely no problem with the state having a psychiatric examination of a defendant early on; it should not have to wait to do so for an unreasonable time. Fairness, equity and justice require it in certain cases; fairness, equity and justice did not, however, require it in this case. Singly or collectively, none of these concepts can even justify, let alone require, the order for the examinations by the trial court. To do as the trial court did, in effect, impermissibly imposed upon the defendant the obligation of undergoing an examination targeting a defense to a crime for which

he had not even yet been properly held to answer under the Connecticut constitution. In addition, however, this imposition went further beyond the date probable cause was found because there was a time beyond that date that the defendant was still not required, or for all we know, even pressed on whether he intended to file a notice of intent. Judicial economy, to which the majority refers, is not an insular consideration that repels other considerations, especially a defendant's constitutional rights. In this instance, it appears to me that it was determined that the defendant's constitutional rights did not outweigh judicial economy.

Justice Felix Frankfurter once said in dissent: "It is a fair summary of history to say that the safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States* v. *Rabinowitz,* 339 U.S. 56, 69, 70 S. Ct. 430, 94 L. Ed. 653 (1950). If we assume, arguendo, that the philosophy of this observation is surely applicable here, as I believe it is, this was not "an appropriate case" for the examination order entered. Fewer constitutional principles have a higher call upon the discretion of a judge than the protection of the privilege against self-incrimination as well as the right to present a defense *after* proper accusation of a crime, especially homicide.

Because I cannot agree that that discretion was correctly exercised here, I respectfully dissent from Part I of the majority opinion.

On the other hand, I cannot agree with the defendant that since all of the testing administered by Phillips and the majority of the examinations conducted by Zeman preceded his filing the notice of his mental status defenses under § 760 was reversible error. In doing so, I agree with the conclusion of the majority on that issue for reasons other than those given.

While it is my view that, inter alia, the trial court's ordering of the examinations in the first instance was error, error which included a violation of the defendant's fifth amendment privilege against self-incrimination, that error was rendered harmless by later events. I agree, as does the majority, that the Appellate Court correctly decided that the initial error in ordering the examination did not, as the trial court found, taint the postnotice examinations by Zeman. Moreover, the Appellate Court noted that there was no evidence that the prenotice and postnotice examinations had elicited different information or that the state has used the prenotice examinations to acquire substantive information concerning the alleged crime.

Under the circumstances of this case, once the defendant filed his notice of intent under § 760 *and* agreed, thereafter, upon query by Zeman, that he then had nothing to change vis-a-vis his prenotice statements prior to additional examination by that psychiatrist *and* he offered evidence at trial, both personally and through experts, concerning his mental status at the time of the offense, in my view, cured any valid pre-existing bar to Zeman's rebuttal testimony.

In coming to this view, I note that even though "[t]he self-incrimination privilege serves a variety of interests beyond the protection of the innocent, yet the [United States Supreme] Court in *Chapman* [v. *California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, reh. denied, 386 U.S. 987, 87 S. Ct. 1283, 18 L. Ed. 2d 241 (1967),] held the harmless error standard applicable to an infringement of that right." 3 W. LaFave & J. Israel, Criminal Procedure § 26.6, p. 274. In any event, a defendant who makes an involuntary statement is not perpetually disabled from giving a subsequent voluntary statement. *Oregon* v. *Elstad,* 470 U.S. 298, 311, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985); *United States* v. *Bayer,* 331 U.S. 532, 540–41, 67 S. Ct. 1394, 91 L.

Ed. 1654 (1947). There was temporally a significant time period between the last prenotice examination and the filing of the notice of intent under § 760 by the defendant that is important. This accords with the rationale of our statement that where the original statement was induced by a violation of the defendant's rights, a subsequent confession can be voluntary where there is a "sufficient ' "break in the stream of events" ' as to justify the admission of [the] subsequent confession." *State* v. *Shifflett,* 199 Conn. 718, 741, 508 A.2d 748 (1986).

I, therefore, concur in affirming the judgment of the Appellate Court.