******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# TWILA WILLIAMS, ADMINISTRATRIX (ESTATE OF TIANA N.A. BLACK), ET AL. *v.* HOUSING AUTHORITY OF THE CITY OF BRIDGEPORT ET AL.
## (SC 19570)

Rogers, C. J., and Palmer, Eveleigh, McDonald,
Espinosa and Vertefeuille, Js.*

*Syllabus*

Pursuant to statute (§ 52-557n [b] [8]), municipalities or their employees shall not be liable for damages resulting from, inter alia, the failure to make an inspection of any property to determine whether the property violates any law or contains a hazard to health or safety unless they "had notice of such a violation of law or such a hazard or unless such failure to inspect . . . constitutes a reckless disregard for health or safety under all relevant circumstances . . . ."

The plaintiff, the administratrix of the estates of four family members who died in an apartment fire in a Bridgeport public housing complex, brought an action against the Bridgeport Fire Department and five officials of the city of Bridgeport, including the fire chief, R, alleging, inter alia, that the decedents died as a result of the defendants' failure to inspect the smoke detection equipment in their apartment for compliance with applicable fire safety codes and regulations. The plaintiff specifically alleged that the defendants failed to conduct a statutorily (§ 29-305) required annual fire safety inspection of the apartment and that the defendants knew or should have known about and remedied a number of asserted defects in the apartment, including the absence of fire escapes and photoelectric smoke detectors. The defendants filed a motion for summary judgment, claiming, with respect to their duty to annually inspect the apartment, that they had no actual notice of any defects or violations at the apartment and therefore that the two exceptions to municipal immunity in § 52-557n (b) (8), actual notice and reckless disregard for health or safety, did not apply. In her opposition to the motion for summary judgment, the plaintiff claimed, inter alia, that the defendants were not entitled to immunity because their failure to conduct any inspections constituted a reckless disregard for health or safety. The trial court granted the defendants' motion for summary judgment and concluded, with respect to the defendants' failure to inspect, that § 52-557n (b) (8) afforded them immunity from liability, as the plaintiff had failed to establish that there was a genuine issue of material fact with respect to either the notice exception or the reckless disregard exception of § 52-557n (b) (8). With respect to the reckless disregard exception, the trial court concluded that knowledge of a dangerous condition was necessary to show the type of reckless conduct necessary to defeat immunity pursuant to § 52-557n (b) (8) and that the plaintiff's failure to present any evidence to contradict the defendants' attestations that they were not aware of any of the alleged violations or fire hazards at the apartment defeated the plaintiff's argument that the reckless disregard exception applied. One week before the trial court granted the defendants' motion for summary judgment, the plaintiff had deposed R. In her motion for reconsideration of the trial court's summary judgment ruling, the plaintiff stated that the basis for the motion was R's concession in his deposition that the fire department was required by statute to conduct annual inspections of the apartment but that it did not conduct the inspections due to a claimed lack of resources. The trial court denied the motion for reconsideration and rendered judgment for the defendants, from which the plaintiff appealed to the Appellate Court. The Appellate Court reversed the judgment of the trial court with respect to its determination that there was no question of material fact as to whether the defendants were immune from liability under § 52-557n (b) (8) for failing to inspect the apartment. The Appellate Court concluded that, under the reckless disregard prong of § 52-557n (b) (8), a failure to inspect constitutes a reckless disregard for health or safety if the municipal officer is aware of the duty to inspect, recog-

nizes the possible impact on public or individual health or safety, and makes a conscious decision not to perform that duty. On the granting of certification, the defendants appealed to this court. *Held*:

1. This court determined that neither the trial court nor the Appellate Court properly articulated the standard that governs the reckless disregard exception to municipal immunity contained in § 52-557n (b) (8), and concluded, on the basis of the language and legislative history of that statute, as well as the common law, that, when a municipality's failure to inspect violates a statute or regulation and the municipality did not have actual notice of a hazard or safety violation, the type of conduct that constitutes reckless disregard is more egregious than mere negligence and requires that health and safety inspectors disregard a substantial risk of harm: the trier of fact ordinarily determines whether a municipality's failure to carry out a mandatory inspection demonstrates a reckless disregard for health or safety under all the relevant circumstances, taking into consideration factors such as the nature or severity of the threat to health or safety that the inspection was intended to identify or thwart, whether the failure to inspect was an isolated event or part of a policy or pattern of failing to inspect an entire class of properties over a period of time, the availability and adequacy of alternative means of identifying and thwarting the threats at issue and the existence of burdens associated with precautionary measures.

2. This court concluded that a jury, considering all the relevant circumstances, reasonably could find that the defendants' persistent failure to inspect the decedents' apartment and thousands of other multifamily units in Bridgeport in violation of their statutory duty under § 29-305 arose from and exemplified a pattern of reckless disregard for public health or safety and created a foreseeable and substantial risk that some tragedy of this general sort would occur, and, accordingly, the defendants were not entitled to summary judgment on that issue: R made numerous statements in his deposition that, although not indicating any knowledge or awareness of specific safety violations or hazards at the apartment prior to the fire, arguably created questions of fact as to whether the defendants demonstrated a reckless disregard for health or safety, including R's statements that he was familiar with all relevant legal and regulatory requirements but was not aware either that the fire department was obligated to annually inspect Bridgeport's public housing complexes or that the fire safety code mandated certain smoke detectors, and that the fire department lacked the resources to carry out mandated inspections but that he did not request any additional inspectors until four years after the fire that killed the decedents.

(*Two justices dissenting in one opinion*)

Argued January 19—officially released December 26, 2017

*Procedural History*

Action to recover damages for, inter alia, the defendants' alleged negligence, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the court, *Sommer, J.*, granted the motion for summary judgment filed by the defendant Bridgeport Fire Department et al. and rendered judgment in their favor; thereafter, the court denied the plaintiff's motion for reconsideration and/or reargument and the plaintiff appealed to the Appellate Court, *Lavine, Mullins* and *Borden, Js.*, which reversed in part the judgment of the trial court, and the defendant Bridgeport Fire Department et al., on the granting of certification, appealed to this court. *Affirmed*.

*Daniel J. Krisch*, for the appellants (defendant City of Bridgeport Fire Department et al.).

*John T. Bochanis*, with whom, on the brief, was *Thomas J. Weihing*, for the appellee (plaintiff).

*Opinion*

ESPINOSA, J. This certified appeal arises out of a tragic fire in which four residents of a Bridgeport public housing complex—Tiana N.A. Black and her three young children—lost their lives. The plaintiff, Twila Williams, as administratrix of the estate of each decedent,[1] brought the present action against the Bridgeport Fire Department and five Bridgeport city officials—Fire Chief Brian Rooney, Fire Marshal William Cosgrove, Mayor William Finch, Zoning Administrator Dennis Buckley, and Building Official Peter Paajanen—(collectively, the municipal defendants) as well as various other defendants who are not parties to the present appeal.[2] The plaintiff alleged, among other things, that the decedents died as a result of the municipal defendants' negligent failure to inspect the smoke detection equipment in their apartment unit for compliance with applicable fire safety codes and regulations. The trial court, *Sommer, J.*, rendered summary judgment for the municipal defendants, concluding, with respect to their alleged failure to inspect, that Connecticut's municipal liability statute, General Statutes § 52-557n, afforded them immunity from liability. The Appellate Court reversed, concluding that a jury reasonably could find that the conduct of the municipal defendants demonstrated "a reckless disregard for health or safety under all the relevant circumstances" and, therefore, that they were potentially liable pursuant to § 52-557n (b) (8).[3] *Williams* v. *Housing Authority*, 159 Conn. App. 679, 696, 124 A.3d 537 (2015). We affirm the judgment of the Appellate Court.

## I

## FACTS AND PROCEDURAL HISTORY

The following undisputed facts and procedural history are relevant to our disposition of this appeal. On November 13, 2009, the date on which the fire occurred, the decedents resided in building 12, unit 205, of the P.T. Barnum Apartments, a group of affordable housing units owned and maintained by the Bridgeport Housing Authority. Unit 205 was located on the second and third floors of a three story apartment building containing twenty residential units. The second floor of the apartment contained a kitchen, a half bath, and a dining/living room area, while the third floor housed three bedrooms and a full bath. Unit 205 had only a single point of ingress and egress, namely, a second floor door that opened onto a porch and an external staircase. Because the building lacked fire escapes, the only means of leaving unit 205 was through that door. This meant that an individual seeking to escape from the bedrooms on the third floor of unit 205 during an emergency had to travel down the internal staircase into the kitchen area, and then traverse the second floor dining/living room area to access the door. Because of frequent

false alarms caused by cooking fumes, some residents of the P.T. Barnum Apartments were in the habit of covering or disabling their smoke detectors.

Pursuant to General Statutes § 29-305 (b),[4] the Bridgeport fire marshal's office is required to conduct annual inspections of all multifamily residential units within Bridgeport. It is undisputed that the neither the municipal defendants nor their employees conducted the mandatory inspection of unit 205 in the year prior to November 13, 2009. Just one day before, however, on the afternoon of November 12, two employees of the housing authority did conduct a routine maintenance inspection of unit 205. The lead inspector, Alexander Guzman, stated that he is certified by the United States Department of Housing and Urban Development to replace smoke detector batteries and carry out health and safety inspections of multiunit residential facilities. In the course of inspecting unit 205, he and his assistant tested the smoke detectors, replaced one nonfunctioning detector, and changed the battery in another. Guzman reported that all of the smoke detectors in unit 205 were functioning properly upon completion of his inspection.

Hours later, in the early morning of Friday, November 13, a fire broke out in the kitchen of unit 205. Although neighbors reported seeing smoke and hearing smoke alarms prior to 12:45 a.m., they assumed that it was a false alarm and did not report the fire via a 911 telephone call until 12:56 a.m. The fire department arrived on the scene at 1:02 a.m. Firefighters extinguished the fire, gained entry to unit 205, and located and attempted to resuscitate the four decedents, each of whom subsequently was pronounced dead at an area hospital. The medical examiner concluded that all four had died of smoke inhalation. In addition, Black's blood alcohol level was found to be 0.23 percent.

Both the fire department and the state police investigated the circumstances surrounding the fire. With respect to the cause of the fire, both agencies concluded that it was accidental. One neighbor reported that Black had been a heavy drinker, who often drank so much alcohol on weekend evenings that she would pass out on the couch and could not be wakened by her children. That same neighbor further reported that Black's "stove was always very dirty, covered with grease and food." Consistent with this report, fire investigators observed a bottle of alcohol on the floor of unit 205, the remnants of combustible packaging, snack chips, and debris piled on the countertops adjacent to the kitchen stove, and several layers of burned grease caked on the stove itself. They also noted: the right rear burner of the gas stove was found in what was believed to be the "HI" or "ON" position; burn patterns suggested that the fire had originated near that burner; there was evidence of human activity near the stove at the time of the fire; and the

burn injuries that Black sustained indicated that she had been in close proximity to the fire at some point, either when it ignited or in the course of trying to extinguish it. On the basis of these observations, investigators concluded that the conflagration was accidental and arose from a fire on the stove with human involvement. Fire department investigators specifically linked the fire to "carelessness," opining that "Black's blood alcohol content would likely have impaired her ability to respond appropriately to the initial alarm and to the fire itself."

Investigators also concluded that the five ionization type smoke detectors within unit 205 were operational at the time of the fire. With respect to the deaths of the decedents, investigators concluded that, given the locations of the bodies within unit 205, it was likely that all four of the decedents had been alerted to the fire and were attempting to leave at the time they died. Specifically, Black and Tyaisja Williams were found in the dining room area, just a few feet from the door; Nyaisja Williams was found on the living room floor; and Nyshon Williams was found near a window in one of the third floor bedrooms. Investigators concluded that the neighbors' delay of eleven minutes or more[5] in notifying the fire department of the fire, combined with Black's elevated blood alcohol content, may have contributed to the four deaths.

The plaintiff commenced the present action against the defendants. In her revised complaint, the plaintiff alleged, among other things, that the municipal defendants failed to ensure that unit 205 complied with state building and fire safety codes, failed to remedy numerous defects in unit 205, and failed to conduct an annual fire safety inspection of unit 205 as required by § 29-305. The plaintiff specifically alleged that the municipal defendants knew or should have known about and remedied a number of asserted defects in unit 205, including the absence of fire escapes or other adequate means of egress, photoelectric smoke detectors, fire alarm systems, fire suppression systems, fire sprinklers, fire extinguishers, and fire safety or prevention plans. She alleged that such conduct on the part of the municipal defendants was both negligent and reckless.

The municipal defendants moved for summary judgment, claiming, among other things, that they were immune from liability for any claims of negligence pursuant to § 52-557n. With respect to allegations of negligence relating to discretionary conduct, the municipal defendants relied on § 52-557n (a) (2) (B), which provides in relevant part that "a political subdivision of the state shall not be liable for damages to person or property caused by . . . negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." With respect to allegations of

negligence relating to any nondiscretionary, ministerial duty, such as the duty annually to inspect unit 205, the municipal defendants relied on § 52-557n (b) (8), which provides in relevant part that "a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . failure to make an inspection or making an inadequate or negligent inspection of any property . . . to determine whether the property complies with or violates any law or contains a hazard to health or safety, *unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances* . . . ." (Emphasis added.) The municipal defendants further contended that they had no actual notice of any defects or violations at unit 205 and, therefore, that there was no question that the two exceptions to municipal immunity contained in § 52-557n (b) (8)— notice of the alleged hazard or violation, and reckless disregard for health or safety—did not apply.

In support of their motion for summary judgment, the municipal defendants submitted affidavits from Finch, Rooney, Cosgrove, Buckley, and Paajanen. Each affiant attested that, prior to November 13, 2009, neither he nor other Bridgeport employees knew of any code violation or safety hazard at unit 205. With the exception of Cosgrove, who offered no opinion as to his office's duty to inspect, each affiant also attested to a belief that he owed no duty to inspect unit 205. Rooney and Cosgrove specifically asserted in their affidavits that they were aware of and familiar with all the responsibilities and duties of the fire department and fire marshal's office, respectively.

In her opposition to the motion for summary judgment, the plaintiff argued, among other things, that the municipal defendants' failure to conduct *any* inspection of unit 205, in alleged violation of § 29-305, constituted the negligent breach of a ministerial duty and, therefore, was not subject to immunity under § 52-557n (a) (2) (B). The plaintiff further contended that the municipal defendants were not entitled to immunity under § 52-557n (b) (8) because both of the exceptions contained in that subdivision allegedly applied to their conduct: (1) they were aware of various code violations at unit 205; and (2) their failure to conduct any inspections constituted a reckless disregard for health or safety. In support of these contentions, however, the plaintiff submitted only the affidavit of Mark Tebbets, an expert on the state building code. Tebbets opined that (1) unit 205 had not been compliant with applicable building and fire safety codes mandating the interconnection of smoke alarms[6] and the size of window openings,[7] (2) the fire department failed to conduct the required annual

inspection of unit 205 to identify those violations, and (3) those undetected violations were causally related to the deaths of the decedents insofar as interconnection of the alarms would have provided earlier notice of the smoke and fire conditions in unit 205 and proper window openings would have facilitated escape from the fire.[8]

The trial court granted summary judgment in favor of the municipal defendants. With respect to their alleged failure to inspect unit 205, the court found that the plaintiff had failed to establish that there was a genuine issue of material fact as to either the notice exception or the reckless disregard exception in § 52-557n (b) (8). As to notice, the court observed that the plaintiff had not presented any evidence to contradict the municipal defendants' attestations that they were not aware of any of the alleged violations. As to recklessness, the trial court characterized the law as follows: "In the context of inspections, courts seem to agree that knowledge of a dangerous condition is necessary to show the type of reckless conduct necessary to defeat immunity pursuant to § 52-557n (b) (8)." Accordingly, the court concluded that the lack of any evidence that the municipal defendants were aware of code violations or fire hazards at unit 205 also defeated the plaintiff's argument that the second statutory exception applied.

The municipal defendants filed their motion for summary judgment on May 1, 2013. The plaintiff filed her objection on May 10 of that year, and the trial court issued its memorandum of decision on July 19, 2013, granting summary judgment in favor of the municipal defendants. One week before, on July 11, 2013, the plaintiff had deposed Rooney. During the course of that deposition, Rooney made numerous statements that, while not indicating any knowledge or awareness of specific code violations or safety hazards at unit 205 prior to the fire, arguably created questions of fact as to whether the municipal defendants demonstrated reckless disregard for the health or safety of the citizens of Bridgeport. For example, Rooney testified that:

• Bridgeport employs only ten fire inspectors, a number that is insufficient to inspect each of the 4000 to 5000 multifamily homes located there.

• Although Rooney requested additional fire inspectors in his 2013 budget, he had not requested additional inspectors in past years' budgets.

• Rooney previously had been named as a defendant in a lawsuit arising from a 2005 fire at a three-family residence located on Iranistan Avenue in which a mother and her two children lost their lives. The plaintiffs in that action alleged that the fire department had failed to inspect the property, as required by statute, and thus had failed to identify the fact that there were no smoke alarms present.

- Prior to that 2005 fire, Bridgeport's fire inspectors "weren't doing the [mandatory] inspections annually on [Bridgeport's more than 3000 three-family homes] unless there was a complaint." Rooney conceded: "I don't know what they were doing." Subsequently, in late 2007 and early 2008, all but one of Bridgeport's inspectors were fired for failing to carry out their inspection duties.

- In 2007 or 2008, Rooney spoke with then Fire Marshal Bruce Collins about the inspection procedure for public housing facilities in Bridgeport. Collins informed him that those facilities carried out their own inspections and, therefore, that the fire marshal's office within the fire department did not inspect them unless there was a complaint. Rooney explained that "[w]e didn't have the resources to do it when we knew that the housing authority was doing it." Rooney conceded, however, that the housing authority's internal inspections were not being conducted by a certified fire marshal—who must pass an examination and study code enforcement at the state fire marshal school—as required by law, and he did not know specifically what the internal inspections entailed.

- In 2013, upon concluding that the fire department lacked the resources to satisfy its statutory duty to conduct a certified inspection of every multifamily residence each year, Rooney began asking his fire officers to assist by conducting informal inspections to identify the most glaring violations. Those officers were to complete approximately 3600 inspections per year. Nevertheless, Rooney made no changes to fire department policy with respect to inspecting public housing facilities after the 2009 fire, due to an alleged lack of resources. Specifically, as of 2013, there still was no procedure in place to inspect the P.T. Barnum Apartments.

- Rooney claimed that he previously was unaware that the fire department was required by law to inspect public housing facilities each year, but that counsel for Bridgeport recently had made him aware of that obligation.

- Rooney was not familiar with any requirement that smoke detectors in multifamily dwelling units be interconnected. The fire department, with assistance from AmeriCorps volunteers, has installed 40,000 smoke alarms in Bridgeport, none of which was interconnected.

- Rooney did not know the specific difference between ionization and photoelectric smoke detectors. He was not aware of the alleged benefits of photoelectric detectors, and he had never considered whether the fire department should install those detectors in addition to or in lieu of ionization types. He also was not familiar with breakaway windows.

• Subsequent to the 2009 fire at issue in this case, Rooney and his staff spent several nights each week visiting each unit in the P.T. Barnum Apartments and checking the smoke detectors. In the course of those visits, he discovered that many of the residents had taken down or covered their smoke alarms in response to previous false alarms. Rooney was able to complete all of these visits in the course of three weeks to one month, after which he proceeded to visit other public housing complexes.

• Subsequent to the 2009 fire, Rooney and other town officials formed a task force to determine what could be done to prevent similar tragedies in the future. The first meeting of the task force was disrupted, however, and he did not recall that the group ever met again.[9]

The transcript of Rooney's deposition was not before the trial court at the time the court decided the motion for summary judgment. On August 7, 2013, the plaintiff filed a motion for reconsideration and/or reargument of the court's July 19 summary judgment ruling in favor of the municipal defendants. The stated basis for the motion was that, in his deposition, Rooney now conceded that the fire department was required by statute to conduct annual inspections of unit 205, but that the fire department did not in fact conduct these inspections due to a claimed lack of resources.[10]

The municipal defendants raised both procedural and substantive arguments in response to the plaintiff's motion for reconsideration and/or reargument. Procedurally, they argued that the motion was improper because it did not present any newly discovered evidence that could not have been included with the plaintiff's initial objection. Specifically, they argued that, at the time they sought summary judgment in May, 2013, the action had been pending for nearly two and one-half years, during which time the plaintiff had not even noticed the defendants' depositions. Substantively, they argued that Rooney's deposition did not afford a basis for reconsideration because there still was no indication that any of the municipal defendants were aware of dangerous conditions in unit 205. After holding a hearing, the trial court denied the motion for reconsideration and/or reargument without memorandum and rendered judgment for the municipal defendants.[11]

The plaintiff appealed to the Appellate Court, which reversed the judgment of the trial court with respect to the determination that there is no question of material fact as to whether the municipal defendants are immune from liability under § 52-557n (b) (8) for failing to inspect unit 205.[12] *Williams* v. *Housing Authority*, supra, 159 Conn. App. 681–82. After determining that § 52-557n (b) (8) is ambiguous and that the legislative history sheds no light on the meaning of the phrase "reckless disregard for health or safety under all the

relevant circumstances," the Appellate Court looked to the common-law definition of recklessness. *Williams* v. *Housing Authority*, supra, 692–94. The court rejected the trial court's interpretation, concluding that treating the recklessness exception as imposing a notice requirement would conflate the two statutory exceptions—actual notice and reckless disregard—and render the latter superfluous. Id., 694 n.13. Instead, the Appellate Court construed the statute as follows: "A failure to inspect that constitutes a reckless disregard for health or safety under § 52-557n (b) (8) [is] one in which an individual is aware of the duty to inspect, recognizes the *possible impact* on public or individual health or safety, and makes the conscious decision not to perform that duty." (Emphasis altered.) Id., 694. Applying that interpretation of the statute, the Appellate Court concluded that a jury reasonably could find that the municipal defendants' failure to inspect unit 205 was reckless. Specifically, the court opined that "[i]t is counterintuitive to an average person that a purported expert, familiar with the duties and procedures of his own office, cannot appreciate the consequences when such duties are not carried out, especially when those duties involve the prevention of life-threatening fires. Thus, a reasonable juror could conclude that [the municipal defendants] would appreciate the natural consequences of their actions."[13] Id., 696.

The municipal defendants appealed from the judgment of the Appellate Court. We granted certification, limited to the following question: "Did the Appellate Court correctly conclude that there was a genuine issue of material fact as to whether the [municipal] defendants' failure to inspect [unit 205] pursuant to . . . § 29-305 (b) constituted a 'reckless disregard for health or safety' under . . . § 52-557n (b) (8)?" *Williams* v. *Housing Authority*, 319 Conn. 947, 125 A.3d 528 (2015).

## II

## LEGAL ANALYSIS

We are in agreement with—and the parties do not challenge—much of the Appellate Court's legal analysis. In brief, the decision of the Appellate Court correctly states the legal standards governing a motion for summary judgment and appellate review thereof; *Williams* v. *Housing Authority*, supra, 159 Conn. App. 688–89; determines that § 52-557n (b) (8) is ambiguous with respect to the exception for municipal immunity for conduct constituting "a reckless disregard for health or safety under all the relevant circumstances"; id., 692–93; and, therefore, looks to external sources such as the common law and the legislative history of the statute to clarify the meaning of that phrase and the standards by which it is to be applied. Id., 692–94.

The primary source of disagreement between the parties is with respect to the legal standard that the Appel-

late Court ultimately adopted. The municipal defendants note that, under both our common law and our Penal Code, conduct is reckless only if it involves the disregard of a substantial risk or high probability of danger that is either known or so obvious that it should be known. See General Statutes § 53a-3 (13);[14] *Matthiessen* v. *Vanech*, 266 Conn. 822, 832–33, 836 A.2d 394 (2003). They argue that the Appellate Court applied an anomalous definition of recklessness and set the bar too low when it held that the reckless disregard exception in § 52-557n (b) (8) is satisfied when public officials merely recognize that failure to conduct a required inspection will have a *possible impact* on public or individual health or safety. See *Williams* v. *Housing Authority*, supra, 159 Conn. App. 694, 696. Adopting this possible impact standard, they contend, unjustifiably waters down the concept of recklessness and places an undue burden on overworked and underresourced municipal employees.

For her part, the plaintiff makes little effort to defend the Appellate Court's novel possible impact standard, conceding in her brief that "[r]ecklessness or w[a]nton behavior implies a conscious disregard of a *high risk*, such as embarking upon a particularly dangerous course of action after actual warning."[15] (Emphasis added.) Instead, she contends that, especially in light of the fact that the fire department's noninspection policy was alleged to have contributed to multiple deaths in the 2005 Iranistan Avenue fire, the trial court should have left to the jury the question of whether the fire department's ongoing failure to conduct any annual inspections of unit 205 constituted a reckless disregard of public health or safety.

For the reasons discussed hereinafter, we conclude that neither of the lower courts properly articulated the standard that governs the reckless disregard exception contained in § 52-557n (b) (8). See part II A of this opinion. When the proper standard is applied, we agree with the Appellate Court that the plaintiff has created a genuine issue of material fact as to whether the municipal defendants, in failing to inspect unit 205, exhibited a reckless disregard for public health or safety under all the relevant circumstances and, therefore, that the trial court should not have granted summary judgment on that issue. See part II B of this opinion.

A

As an initial matter, we agree with the Appellate Court that the plain language of § 52-557n (b) (8) will not support the trial court's interpretation of the reckless disregard exception. After reviewing *Smart* v. *Corbitt*, 126 Conn. App. 788, 14 A.3d 368, cert. denied, 301 Conn. 907, 19 A.3d 177 (2011), and several decisions of the Superior Court, the trial court concluded that "[i]n the context of inspections, courts seem to agree that knowledge of a dangerous condition is necessary to show the

type of reckless conduct necessary to defeat immunity pursuant to § 52-557n (b) (8)." Leaving aside the question of whether the trial court correctly parsed the cited case law, we note that the municipal liability statute carves out two distinct exceptions to municipal immunity for failure to inspect: when a political subdivision has notice of a violation or hazard, and when it demonstrates a reckless disregard for health or safety under all the relevant circumstances. See General Statutes § 52-557n (b) (8). Adopting the trial court's rule that reckless disregard can be proven only when public officials have knowledge of a dangerous condition would render the two exceptions essentially redundant, in violation of cardinal principles of statutory interpretation. See, e.g., *American Promotional Events, Inc.* v. *Blumenthal*, 285 Conn. 192, 203, 937 A.2d 1184 (2008).

Nor are we persuaded, however, by the Appellate Court's alternative interpretation of the statute. Our own analysis diverges from that of the Appellate Court in three primary respects.

1

First, with regard to the statutory language itself, the Appellate Court decision focuses more or less exclusively on the meaning of the word "reckless" in § 52-557n (b) (8) and does not address how, if at all, the phrase "under all the relevant circumstances" modifies the meaning of "a reckless disregard for health or safety . . . ." See *Williams* v. *Housing Authority*, supra, 159 Conn. App. 693–95. At first blush, it may be tempting to assume that the relevant circumstances language is mere surplusage, as it is well established that recklessness, like negligence, generally can be assessed only in the context of particular factual circumstances. See *State* v. *Montanez*, 219 Conn. 16, 24 n.7, 592 A.2d 149 (1991); *Bowen* v. *Hartford Accident & Indemnity Co.*, 122 Conn. 621, 624–25, 191 A. 530 (1937). With respect to § 52-557n (b), however, we find it noteworthy that, whereas subdivision (8) carves out an exception for failures to inspect that constitute "a reckless disregard for health or safety *under all the relevant circumstances*"; (emphasis added); the immediately preceding subdivision, which addresses municipal liability for harms arising from the issuance or denial of licenses and permits, contains a similar recklessness exception, but omits the highlighted language. Section 52-557n (b) (7) provides in relevant part that "a political subdivision of the state or any employee, officer or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . the issuance, denial, suspension or revocation of, or failure or refusal to issue, deny, suspend or revoke any permit, license, certificate, approval, order or similar authorization, when such authority is a discretionary function by law, unless such issuance, denial, suspension or revocation or such fail-

ure or refusal *constitutes a reckless disregard for health or safety* . . . ." (Emphasis added.) We must assume that the legislature's decision to include the "relevant circumstances" language in subdivision (8), but to omit it from the otherwise identical exclusion provision in subdivision (7), was a purposeful one. See, e.g., *State* v. *Heredia*, 310 Conn. 742, 761, 81 A.3d 1163 (2013).

Although the statute itself provides no guidance as to the specific types of circumstances that are to be taken into account when assessing the recklessness of a municipality's decision not to conduct a health or safety inspection,[16] the legislature's use of the modifying phrase "under *all* the relevant circumstances"; (emphasis added) General Statutes § 52-557n (b) (8); suggests that we are to view the exception through a broad lens. In the context of a failure to inspect, it is reasonable to assume that any of the following factors, among others, may be relevant: whether the inspection is mandated by statute or regulation; how frequently inspections are required to be conducted; the nature and severity of the threat to health or safety that the inspection is intended to identify or thwart; whether, and how frequently, threats of that sort have come to pass in the past, either at the location in question or at similar locations; whether the premises involved featured any unique or atypical susceptibilities to risk; the reasons why the inspection was not conducted; whether the failure to inspect was an isolated event or part of a policy or pattern; the number of properties or locations that went without inspection; whether other municipalities or jurisdictions routinely neglect to carry out inspections of the type at issue; the availability and adequacy of alternative means of identifying and thwarting the threats at issue; and whether the municipal officials involved were aware or should have been aware of the answers to each of these questions. As we discuss more fully in part II B of this opinion, in the present case, many, if not most, of these factors would appear, on the record before us as construed in the light most favorable to the plaintiff, to support a potential finding that the municipal defendants' long-standing policy of not inspecting any of Bridgeport's public or three-family housing facilities for fire risks and not educating themselves as to the adequacy of the housing authority's own internal inspections demonstrated a reckless disregard for health or safety under the circumstances.

2

Second, we disagree with the Appellate Court's assessment that the legislative history of § 52-557n (b) (8) fails to illuminate the meaning of the reckless disregard exception. *Williams* v. *Housing Authority*, supra, 159 Conn. App. 693. That provision was enacted as part of No. 86-338 of the 1986 Public Acts. It is true that, in other contexts, we have characterized the legislative

history of § 52-557n as "worse than murky . . . ." (Internal quotation marks omitted.) Id., quoting *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 188, 592 A.2d 912 (1991). The lengthy legislative debates do reveal, however, that the drafters of the tort reform legislation of 1986 envisioned that the question of whether the violation of a statutory obligation constitutes reckless disregard for public health or safety for purposes of municipal immunity ordinarily would be one for the trier of fact. For example, when asked to clarify how the reckless disregard standard would apply to injuries caused by a school bus driven with tires lacking sufficient tread, an author of the bill, Representative Robert G. Jaekle, responded: "[I]f I were the attorney for the children . . . I would certainly make a case that the driving of that school bus with tread below the legal limit was more than mere negligence and would probably cite some statutes or [Department of Motor Vehicles] regulations about tread on tires as an indication that that was reckless. . . . [*T*]*hat I believe would at least get me into court to try that issue* and see whether I could prove how bad that negligence was and whether that crossed the line into reckless action on the part of the municipality."[17] (Emphasis added.) 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5899–900; see also id., p. 5936, remarks of Representative Robert G. Jaekle ("as in so many of these hypotheticals, much is left to a decision of fact as to whether we are into negligence or into wilful or wanton or reckless"); 29 H.R. Proc., Pt. 22, 1986 Sess., pp. 8116–17, remarks of Representative Robert G. Jaekle (suggesting that, depending on specific facts of case, municipal inspector's total failure to visit building site might amount to "reckless disregard for . . . health and safety under all the relevant circumstances"). But see 29 H.R. Proc., Pt. 22, 1986 Sess., p. 8120, remarks of Representative Robert G. Jaekle (opining that when municipal inspector fails to identify defect in new construction caused by third party, third party should bear liability for injuries resulting from defect).

The legislative history of the municipal immunity statute thus supports the plaintiff's argument that recklessness ordinarily presents a question of fact for the jury and controverts the municipal defendants' contention that, especially in the context of a failure to inspect, "it [is] a daunting task just to get to a jury on recklessness."[18] In this respect, the apparent legislative intent with respect to municipal inspections is consistent with the general rule that, when a defendant's conduct represents more than mere "momentary thoughtlessness or inadvertence," whether it rises to the level of "reckless or wanton misconduct on any given state of facts [ordinarily] is a question of fact for the jury." (Internal quotation marks omitted.) *Brock* v. *Waldron*, 127 Conn. 79, 83, 14 A.2d 713 (1940); accord *Frillici* v. *Westport*, 264 Conn. 266, 277, 823 A.2d 1172 (2003); *Craig* v. *Driscoll*,

64 Conn. App. 699, 721, 781 A.2d 440 (2001), aff'd, 262 Conn. 312, 813 A.2d 1003 (2003).[19]

### 3

Third, although it was not improper for the Appellate Court to look to the common law for guidance as to the meaning of the term "reckless disregard," the decision of that court does not cite—and our own research has not revealed—any authority in the common law for the "possible impact" standard that the court ultimately adopted. See *Williams* v. *Housing Authority*, supra, 159 Conn. App. 694, 696. It is well established, in both the civil and criminal contexts, that a person acts with reckless disregard when he ignores a substantial risk of harm. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 382–83, 119 A.3d 462 (2015); *State* v. *Dyson*, 217 Conn. 498, 502, 586 A.2d 610 (1991). There is no indication that the legislature intended to adopt a lower standard for recklessness in the context of municipal inspections, one requiring that a defendant merely disregard a possible impact on public or individual health or safety. Indeed, adopting such a standard would effectively eliminate the distinction between negligence and recklessness that has long been a cornerstone of our public liability/immunity law. See, e.g., General Statutes § 4-165 (a); *Spears* v. *Garcia*, 263 Conn. 22, 36, 818 A.2d 37 (2003).

Finally, having rejected the Appellate Court's possible impact standard for reckless disregard, we must resolve a dispute between the parties as to the whether the risk disregarded must be substantial not only in its impact or consequence but also in its likelihood. The municipal defendants contend that "[p]robable consequences are the hallmark of recklessness," and that the reckless disregard exception applies only if the municipal defendants ignored (1) a likely harm (2) specific to unit 205. The plaintiff, by contrast, avers that it may be reckless to disregard a grave risk, such as a life threatening fire in a multifamily dwelling, even if it is relatively uncommon, and also that the risk involved can be a generalized one that is not specific to the premises in question. In the limited and specific context of a failure to inspect under § 52-557n (b) (8), we agree with the plaintiff.

With respect to the probability of risk, we begin by recognizing that the magnitude of a potential risk generally is understood to be the product of "the likelihood that [the person's] conduct will injure others [multiplied by] the seriousness of the injury if it happens . . . ." (Internal quotation marks omitted.) *Considine* v. *Waterbury*, 279 Conn. 830, 868 n.20, 905 A.2d 70 (2006). It is true that this court, on occasion, has suggested that a defendant is guilty of reckless misconduct only when he knows or should know that there is "a high degree of *probability* that substantial harm will result" from his actions. (Emphasis added; internal quotation

marks omitted.) *Brock* v. *Waldron*, supra, 127 Conn. 84; see, e.g., *State* v. *Bunkley*, 202 Conn. 629, 645, 522 A.2d 795 (1987). In most instances, however, we have defined recklessness simply as disregarding a high *degree* or *substantial risk* of danger, leaving open the question whether it may be reckless to engage in conduct that carries a relatively low likelihood of causing momentous harm.[20] See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, supra, 317 Conn. 381–83; *Matthiessen* v. *Vanech*, supra, 266 Conn. 830–34. In any event, regardless of what standards govern allegations of recklessness in other contexts, we conclude that, in the context of § 52-557n (b) (8), a municipal actor may demonstrate reckless disregard for health or safety when it is clear that the failure to inspect may result in a catastrophic harm, albeit not a likely one. There is little doubt that it might be reckless if federal regulators adopted a policy of not conducting safety inspections at nuclear power plants or airlines of their passenger planes, notwithstanding the relatively low probability of a disaster occurring in any particular instance. Representative Jaekle's comments suggest that the failure regularly to inspect school bus tires also would present a jury question as to recklessness, despite the general infrequency of fatal bus crashes. See 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5899–900. We see no reason why the same principles should not apply to a fire department's failure to carry out fire safety inspections at multifamily apartment buildings, especially ones such as the one occupied by the decedents, where limited means of egress increase the likelihood that any particular fire will result in casualties.

We also agree with the plaintiff that, particularly when a municipality has adopted a policy of not carrying out any inspections of a certain type, § 52-557n (b) (8) permits the finder of fact to assess the aggregate level of risk associated with that policy, and not only the limited risk posed to the specific premises at which the hazard happened to transpire. As we have discussed, the reckless disregard exception applies when a municipality does not have actual notice of a hazard or violation at particular premises. Under those circumstances, it would make little sense to construe the exception to apply only when a municipal actor disregards a particular, premise-specific risk. Moreover, mandated inspections such as fire safety inspections are, by their very nature, standardized procedures that are intended and designed to identify general risks of the sort that may occur rarely but can affect any property of a certain type. If a municipality adopts a policy of not conducting any such inspections, it presumably does so with a view toward the total resources that can be saved thereby. On the other side of the ledger, we see no reason why a jury should not be permitted to weigh the aggregate risks that may ensue if hundreds or thousands of premises go uninspected.

With regard to the governing legal standard, the dissent contends that we have "(1) fail[ed] to sufficiently distinguish reckless disregard from negligence, (2) fail[ed] to recognize that the burden of preventing the risk of harm is an essential element of recklessness, (3) fail[ed] to recognize that the reckless disregard prong of § 52-557n (b) (8) generally requires proof specific to the subject premises, and (4) improperly allow[ed] for aggregation of risk based solely on the shared circumstance of noninspection." We address each concern in turn.

With respect to the dissent's first concern, to the extent that we have not made it abundantly clear, we take this opportunity to reiterate that the type of conduct that constitutes reckless disregard for purposes of § 52-557n (b) (8) is more egregious than mere negligence and requires that health and safety inspectors disregard a substantial risk of harm. See *Matthiessen* v. *Vanech*, supra, 266 Conn. 833–34. Although the dissent is correct that certain conduct, on its face, might qualify as either negligent or reckless, the dissent seemingly fails to recognize that, where either conclusion is possible, whether any particular (mis)conduct rises to the level of recklessness—in light of the actor's mental state and the magnitude of the potential harm involved—is to be determined by the trier of fact. Accordingly, the principal question before this court is whether, on the evidence of record, a jury reasonably could conclude that the municipal defendants chose to ignore a substantial risk of harm.

We also categorically reject the dissent's suggestion that we have embraced a per se theory of recklessness with respect to the failure to perform mandated health or safety inspections. Rather, we have identified numerous factors that the trier of fact may consider in assessing whether any particular failure to carry out a statutorily mandated inspection demonstrates a reckless disregard for health or safety *under all the relevant circumstances*.

With respect to the second concern, the dissent cites no controlling authority for the proposition that the burden of preventing the risk of harm is an "essential element" of recklessness. Indeed, the dissent concedes, as it must, that this novel theory only recently has been proposed in the Restatement (Third) of Torts and that it has not been adopted as the law of Connecticut. Notably, the Restatement (Third) itself recognizes that its novel, law and economics definition of recklessness may not be appropriate in every context in which recklessness is at issue. 1 Restatement (Third) Torts, Liability for Physical and Emotional Harm, § 2, comment (b), p. 19 (2010). The authors of the Restatement (Third) also acknowledge that, in many instances, disregard of

a high probability of harm is itself indicative of recklessness, without the need to consider the existence of or burdens associated with precautionary measures. Id., comment (e), p. 21. We do not dispute, however, that, in many circumstances, such burdens will be among those factors to be weighed by the trier of fact in making a finding of recklessness. The jury is certainly free to consider them here.

With respect to the dissent's third concern—that it would somehow be internally inconsistent to read the second exception contained in § 52-557n (b) (8) to encompass risks and considerations beyond those specific to the subject premises—the dissent's crabbed interpretation of the statute finds no more support in the text than it does in the cannons of construction to which the dissent appeals. In short, we fail to understand in what sense there is even a tension, let alone a contradiction, in the legislature having intended what the plain language of the statute clearly suggests, namely, carving out two exceptions to governmental immunity: a more specific one for public safety officials who fail to inspect a property known to have a particular code violation or safety hazard, and a more general one for officials whose failure to inspect demonstrates a disregard for public health or safety "under all the relevant circumstances . . . ." It can hardly be disputed that a public official who routinely ignores his duty to carry out important fire safety inspections demonstrates greater disregard for the public's health or safety than does an official who misses only one such inspection. The dissent has suggested no reason why the legislature would not have intended for a jury to take such considerations into account. Indeed, given that § 52-557n (b) (8) provides for the imposition of liability when a failure to inspect constitutes a reckless disregard for health or safety *under all the relevant circumstances*, the statute itself clearly invites, if not requires, the trier of fact to take into account broader considerations, such as inspection policies and the history of conflagrations at residences of this type.

Finally, the dissent contends that we improperly have concluded that a public safety official's failure to inspect a class of properties necessarily implies that the official has adopted a general, unitary policy of not carrying out such inspections. Nothing could be further from the truth. Once again, all we have held herein is that, when confronted with evidence that an official has failed to inspect an entire class of properties over a period of time, a *jury* is not precluded either from finding as a matter of fact that those failures to inspect were the result of a general policy of noninspection or from concluding that the adoption of such a policy demonstrated a reckless disregard for public health or safety. The present record contains sufficient evidence to allow a jury to make such determinations.

B

In part II A of this opinion, we clarified the second exception to municipal immunity contained in § 52-557n (b) (8) and, specifically, the standards governing when the failure to conduct a municipal inspection constitutes "a reckless disregard for health or safety under all the relevant circumstances . . . ." We concluded that, particularly when the failure to inspect violates some statute or regulation, the question of recklessness ordinarily will be one for the jury, taking into account all relevant circumstances. We also concluded that when the failure to inspect is not an isolated incident but results from a general policy of not conducting inspections of a certain type, the jury reasonably may consider whether the policy itself indicates a reckless disregard for public health or safety.

In this subpart of the opinion, we consider whether the Appellate Court properly determined that a jury reasonably could find, on the basis of the proof submitted in opposition to the motion for summary judgment and the inferences reasonably to be drawn therefrom, that the conduct of the municipal defendants demonstrated a reckless disregard for public health or safety under the circumstances. We conclude that the plaintiff met her burden in this respect and that the municipal defendants were not entitled to summary judgment on that issue.

1

The Rooney deposition and the various affidavits submitted in support of and in opposition to the motion for summary judgment, construed in the light most favorable to the plaintiff as the nonmoving party, suggest that, over the course of many years, the municipal defendants maintained a policy of not conducting *any* routine fire safety inspections of the thousands of public housing units in Bridgeport in the absence of a complaint or request,[21] and also of not routinely inspecting certain of its more than 3000 three-family homes, in violation of their statutory duty under § 29-305 (b). These policies remained in effect after 2005, despite the fact that the failure to inspect allegedly resulted in multiple fatalities during the Iranistan Avenue fire. Rooney also delayed for eight years after that fire before implementing the stopgap measure of asking his officers to assist by carrying out informal inspections of high risk dwellings. Following the 2009 fire at issue in this case, the municipal defendants failed to follow through on measures such as a task force that had been formed to determine what could be done to prevent similar tragedies in the future.

Moreover, Rooney's stated rationales for the fire department's noninspection policy raise additional questions as to whether he and the other municipal defendants acted in reckless disregard of public safety.

He claimed to have been familiar with all relevant legal and regulatory requirements, but also not to have been aware either that the fire department was obligated to annually inspect Bridgeport's public housing complexes or that the fire safety code mandated that the smoke alarms in unit 205 be interconnected. See footnote 6 of this opinion. Rooney claimed that the fire department lacked the resources to carry out the mandated inspections, but he did not request any additional inspectors until 2013. He claimed that his ten person fire marshal division lacked the manpower to inspect Bridgeport's public housing complexes, but conceded that, by setting aside a few hours in the evenings following the 2009 fire, he had been able to personally visit, over the course of just several weeks, each unit in the P.T. Barnum Apartments to check smoke detectors. He claimed that he saw no need for the fire department to carry out its mandated inspections when the housing authority was conducting its own internal inspections, but conceded that he did not know and had never inquired as to the nature or extent of the inspections that were conducted by the housing authority's unlicensed inspectors. Finally, Rooney appeared to be unfamiliar with common smoke detection technologies and not to have educated himself as to their potential advantages and shortcomings.[22]

In light of this factual record, we agree with the Appellate Court that a jury, considering all the relevant circumstances, reasonably could find that the municipal defendants' persistent failure to inspect unit 205 and thousands of others like it both arose from and exemplified a pattern of reckless disregard for public health or safety. We understand that it may have been extremely unlikely that the municipal defendants' noninspection policy would result in fire related fatalities of this sort at this particular apartment. Such fires are, in general, a rare and unpredictable occurrence. See *Evon* v. *Andrews*, 211 Conn. 501, 508, 559 A.2d 1131 (1989). Moreover, if the plaintiff's allegations are true, in this instance, it appears that the housing authority's internal fire safety inspections may have been inadequate only because an unfortunate and unlikely confluence of factors—a heavily inebriated parent of young children apparently operated her gas stove late at night, in close proximity to highly combustible debris, in a building where false alarms were sufficiently common that neighbors delayed before calling emergency services—meant that interconnection of the unit's smoke alarms could have changed the outcome. As we have explained, however, the jury is free to consider not only whether this particular hazard at this particular location was a predictable result of the failure to inspect, but also whether, in light of the allegations surrounding the 2005 Iranistan Avenue fire, the municipal defendants' admitted lack of diligence and decision not to inspect thousands of multifamily units that are home to Bridgeport's

least affluent residents created a foreseeable and substantial risk that some tragedy of this general sort would occur, thus constituting a reckless disregard for health or safety.

2

We are not persuaded by the dissent's argument that we improperly have decided this case on the basis of a "theory of liability"—the municipal defendants' apparent policy of not conducting mandatory inspections of many multifamily housing units in Bridgeport over a period of years—that the plaintiff never advanced. The dissent misperceives the governing law, the nature of our decision, and the appellate record in this case.

Under modern pleading practice, "pleadings must be construed broadly and realistically, rather than narrowly and technically." (Internal quotation marks omitted.) *Connecticut Coalition for Justice in Education Funding, Inc.* v. *Rell*, 295 Conn. 240, 253, 990 A.2d 206 (2010). For this reason, the dissent's reliance on *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 621, 99 A.3d 1079 (2014), is misplaced. *White* stands for the proposition that a plaintiff, having pleaded and presented his case according to one theory of liability, cannot on appeal seek to have the case resolved according to a fundamentally different theory, one that involves distinct essential elements and of which the defendant was never given notice. See id., 619–20. That is not the case here. Here, the plaintiff alleged in her complaint that the municipal defendants acted recklessly by failing to conduct the mandatory annual inspection *of unit 205*, and it is on that theory of liability that the case has been resolved. The question at issue is merely whether, in assessing whether the municipal defendants' failure to inspect *that particular unit* was reckless, the jury may consider various *factors* that put that decision into context. These include whether the failure to inspect was intentional, whether it was part of a broader policy of nonenforcement, whether it reflected an improper delegation of the municipal defendants' statutory duties to unqualified housing authority employees, whether it was justified by a lack of available inspection resources, and whether it was preceded by other instances in which the municipal defendants' failure to inspect resulted in catastrophic fire losses. Each of those questions bears directly on the plaintiff's theory of the case.

Moreover, to the extent that the dissent is particularly concerned with the question of the municipal defendants' broader history of noncompliance with their statutory duties, it is clear that they were on notice that that policy fell within the ambit of the plaintiff's complaint. Whereas some of the plaintiff's interrogatory requests sought information specific to the municipal defendants' inspections of unit 205, many others sought information regarding their general "policies or procedures

that relate to the inspection of properties for fire and safety code violations," as well as their past history of inspecting the entire P.T. Barnum Apartments housing complex. Relatedly, as the dissent concedes, during Rooney's deposition, the plaintiff's counsel questioned Rooney on multiple occasions and at some length regarding the municipal defendants' general inspection policies with respect to multifamily housing units. Then, in her motion for reconsideration and/or reargument, the plaintiff emphasized that reconsideration was warranted in part because "Rooney admitted in his deposition that he was aware [that] [Bridgeport] did not conduct inspections of three family residences (which would include the premises which are the subject of the fire in the instant case) because of a claimed lack of resources." It also is noteworthy that the trial court, in its memorandum of decision, framed the question as "whether the fire marshal, by allegedly neglecting to undertake annual *inspections* as required by § 29-305, engaged in a 'reckless disregard for health or safety under all the relevant circumstances.'" (Emphasis added.) The court's use of the plural here is noteworthy, insofar as the statute only would have required one inspection of unit 205 in the year prior to the fire. Also notable is the court's recognition that *Pinos* v. *Mystic Fire District*, Docket No. CV-09-5012096, 2011 WL 1565874 (Conn. Super. March 30, 2011), favored the plaintiff's position. In that case, the trial court found that a material fact existed as to whether the Mystic Fire District's failure to inspect the subject premises prior to a fatal fire constituted recklessness for the purposes of § 52-557n (b) (8) in large part because the fire marshal's office had conducted fewer than one half of the mandated inspections citywide during the two years prior to the fire. See id., *2–4. Accordingly, we reject the dissent's suggestion that these considerations do not fall within the ambit of the plaintiff's complaint.

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and EVELEIGH and VERTEFEUILLE, Js., concurred.

* The listing of justices reflects their seniority on this court as of the date of oral argument.

[1] The other decedents were Black's five year old son Nyshon Williams and her twin four year old daughters, Nyaisja Williams and Tyaisja Williams.

[2] The other defendants were the Housing Authority of the City of Bridgeport, Worth Construction Co., Inc., Kasper Group, Inc., Patrick M. Rose, Philip L. Tiso and Bruce Morris.

[3] General Statutes § 52-557n (b) (8) provides in relevant part: "[A] political subdivision of the state or any employee, officer, or agent acting within the scope of his employment or official duties shall not be liable for damages to person or property resulting from . . . (8) failure to make an inspection or making an inadequate or negligent inspection of any property . . . to determine whether the property complies with or violates any law or contains a hazard to health or safety, unless the political subdivision had notice of such a violation of law or such a hazard or unless such failure to inspect or such inadequate or negligent inspection constitutes a reckless disregard for health or safety under all the relevant circumstances . . . ."

[4] General Statutes § 29-305 (b) provides in relevant part: "Each local fire marshal shall inspect or cause to be inspected, at least once each calendar year . . . in the interests of public safety . . . all occupancies regulated

by the Fire Safety Code within the local fire marshal's jurisdiction, except residential buildings designed to be occupied by one or two families . . . for the purpose of determining whether the requirements specified in said codes relative to smoke detection and warning equipment have been satisfied. . . ."

[5] One witness reported that the delay could have been as long as thirty or forty minutes.

[6] When smoke alarms are interconnected, the activation of any one alarm triggers all of the other alarms.

[7] The municipal defendants do not concede that relevant building and fire safety codes required these features in unit 205. The parties have not briefed this issue, however, and the record on appeal is inadequate for us to resolve it as a matter of law. Accordingly, in light of the procedural posture in which this case reaches us, we assume without deciding that Tebbets was correct in his assessment.

[8] Notably, in her opposition, the plaintiff failed to proffer any evidence that the municipal defendants had actual notice of the alleged code violations at unit 205 or that they otherwise exhibited reckless disregard of public health or safety. She appears to have been under the mistaken belief that the standard governing a motion for summary judgment is the same as the standard governing a motion to strike, and that she could continue to rest on her pleadings even after the municipal defendants set forth evidence that they were not aware of any code or safety violations. Ordinarily, this failure to establish a genuine issue of material fact at the summary judgment stage would render her appeal from the trial court's decision moot. But see footnote 11 of this opinion.

[9] We express no opinion as to whether any evidence of post-2009 conduct would be admissible at trial. See Conn. Code Evid. § 4-7 (a) (evidence of subsequent remedial measures admissible to show feasibility of precautionary measures); *Streeter* v. *Executive Jet Management, Inc.*, Docket No. X-01-020179481-S, 2005 WL 4357633, *7 (Conn. Super. November 10, 2005) (rule does not necessarily preclude testimony that no subsequent remedial measures were taken).

[10] Curiously, the plaintiff did not draw to the court's attention any of Rooney's other statements that arguably could permit a jury to conclude that the municipal defendants had demonstrated a reckless disregard for public health or safety. However, the plaintiff did submit the full deposition transcript in support of her motion.

[11] Because the trial court did not issue a memorandum of decision, it is unclear whether the court (1) was persuaded by the municipal defendants' procedural arguments that the Rooney deposition was not properly before the court, or (2) entertained the new deposition evidence but concluded that Rooney's statements did not create, as a matter of law, a material question as to whether the municipal defendants demonstrated reckless disregard for public health or safety under all the relevant circumstances. We note, however, that the court allowed extensive argument as to the substantive issues raised by the deposition. Moreover, on appeal to this court, the municipal defendants did not move to strike the plaintiff's appendix, which contains the deposition transcript in its entirety, and, at oral argument, the appellants' counsel conceded that we may consider the full deposition transcript. Finally, the municipal defendants have not raised as an issue on appeal the propriety of the Appellate Court's reliance on the Rooney deposition in concluding that questions of material fact rendered summary judgment improper. See *Williams* v. *Housing Authority*, supra, 159 Conn. App. 686–95. Accordingly, we will assume for purposes of this appeal that the Rooney deposition is properly in the record. See *Hirsch* v. *Braceland*, 144 Conn. 464, 469, 133 A.2d 898 (1957); cf. *State* v. *Manfredi*, 213 Conn. 500, 512, 517, 569 A.2d 506 (1990).

[12] The plaintiff's other claims of error before the Appellate Court are not at issue in the present appeal.

[13] The Appellate Court also determined that there was a question of material fact as to whether Rooney and Cosgrove were aware of their duty to inspect at the time of the fire. *Williams* v. *Housing Authority*, supra, 159 Conn. App. 695. The municipal defendants do not challenge this determination.

[14] General Statutes § 53a-3 (13) provides: "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes

a gross deviation from the standard of conduct that a reasonable person would observe in the situation. . . .”

[15] At oral argument before this court, the plaintiff's counsel took a different tact, arguing that there is no meaningful distinction between a possible risk and a likely one. That can't be right. The reasonable man may walk to lunch on a drizzly day, despite the *possibility* that he might get caught up in a storm and struck by lightning. But once the tempest rages, such that any pedestrian *likely* will be struck, it would be foolhardy not to call a taxicab.

[16] Because it is uncontested that the municipal defendants failed to conduct any inspection of unit 205, we need not decide what standards would apply to a case in which an allegedly inadequate or negligent inspection was conducted.

[17] We recognize that other statements in the legislative history suggest that recklessness will be difficult to prove in the context of a failure to inspect or inadequate inspection. See, e.g., 29 H.R. Proc., Pt. 16, 1986 Sess., pp. 5919–20, remarks of Representative John Wayne Fox; id., pp. 5921–22, remarks of Representative Martin Looney; see also id., p. 5941, remarks of Representative Richard D. Tulisano (cautioning supporters of bill that future plaintiffs “might get in the door by the allegation [of recklessness], but [they] will never be able to sustain the burden”). Those statements, however, were made by opponents of the municipal immunity provisions of the 1986 tort reform legislation and, therefore, are not as clearly indicative of the legislative intent of the bill as are the comments of the author.

[18] The municipal defendants offer various arguments as to why allowing claims of this sort to be decided by juries constitutes bad public policy. Such arguments are more appropriately addressed to the legislature than to this court. See, e.g., *Savings & Loan League of Connecticut, Inc.* v. *Connecticut Housing Finance Authority*, 184 Conn. 311, 316, 439 A.2d 978 (1981).

[19] To support their argument to the contrary, the municipal defendants direct our attention to two cases in which this court concluded that allegations of recklessness were, as a matter of law, insufficient to create a jury question, namely, *Elliott* v. *Waterbury*, 245 Conn. 385, 715 A.2d 27 (1998), and *Brock* v. *Waldron*, supra, 127 Conn. 79. Both are readily distinguishable.

In *Elliott*, the plaintiff's decedent was accidentally shot and killed while jogging near a public watershed area on which the defendants permitted recreational hunting. *Elliott* v. *Waterbury*, supra, 245 Conn. 389. This court upheld the trial court's grant of summary judgment in favor of the defendants on the plaintiff's reckless conduct claim, concluding that a trier of fact could not reasonably conclude that, in allowing hunting on the watershed land, the defendants had engaged in “highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent.” (Internal quotation marks omitted.) Id., 418. In so concluding, this court relied on unique considerations that do not apply to the present case. We emphasized, for example, that Connecticut has a clear policy of encouraging landowners to open their land for recreational hunting and that an independent regulatory regime governs hunting safety. Id., 416–18.

The municipal defendants turn back nearly eighty years, to *Brock*, to muster another case in support of their argument that plaintiffs must pass a “high threshold” to reach a jury on a claim of recklessness. *Brock* involved a motor vehicle accident in which a driver, travelling too fast on a slick road and with a dirty windshield, struck and killed a pedestrian. *Brock* v. *Waldron*, supra, 127 Conn. 81–82. In that case, the complaint did not clearly plead a cause of action in recklessness, and the trial court did not become aware of the plaintiff's recklessness claim until after the close of evidence, when it reviewed the plaintiff's request to charge. Id., 80–81. The plaintiff's counsel arguably abandoned the claim during the charging conference, but new appellate counsel later raised the court's refusal to charge the jury on recklessness as a potential ground for appeal. Id., 80. In upholding the trial court's refusal to charge, this court observed that the recklessness claim rested primarily on an unquantified allegation of excess speed that “depend[ed] entirely on inferences from doubtful physical facts in evidence.” Id., 84. Accordingly, even if we were to put aside the question of whether a case that grappled with the concept of reckless driving during the early days of the mass-produced automobile has any bearing on the standards governing municipal fire safety inspections in the twenty-first century, it is clear that *Brock* was a procedurally and factually unique case that does not support the general rule for which the municipal defendants cite it.

[20] The municipal defendants draw our attention to a comment in the

Restatement (Second) of Torts that indicates that the violation of a statute is reckless only to the extent that it involves "a high degree of probability that serious harm will result." 2 Restatement (Second), Torts § 500, comment (e), p. 589 (1965). Other comments to that section suggest, however, that recklessness does not require an actual likelihood of harm, such that the probability of injury is greater than 50 percent, but merely that the risk is "substantially in excess of that necessary to make the conduct negligent." Id., comment (a), p. 588. We read comment (e) in that light.

[21] See Park City Communities, "About Us," available at http://www.parkcitycommunities.org/about-us/ (last visited December 6, 2017) (agency manages approximately 2600 public housing equivalent units). We note that Park City Communities was formerly known as the Bridgeport Housing Authority.

[22] Rooney's testimony, construed in the light most favorable to the plaintiff, tended to establish, among other things, that the Bridgeport fire marshal division pursued a long-standing policy of not inspecting any public housing facilities, in the absence of a complaint or request, and also of not routinely inspecting multifamily housing units, despite its knowledge that that policy had resulted in fatal fires on previous occasions. We agree with the dissent that, pursuant to § 29-305, Rooney himself was not responsible for carrying out the mandatory annual inspections. Because the issue is not before us, we need not determine whether any of Rooney's own actions subjected either him or Bridgeport to potential liability under § 52-557n.

———————————————